ORIGINAL

# UNITED STATES COURT OF FEDERAL CLAIMS

FILED

DEC 19 2005

U.S. COURT OF FEDERAL CLAIMS

**CPN CASCADE, INC. (formerly d/b/a CE NEWBERRY, INC.),**
**a Delaware Corporation**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

No. 05-1316C

## COMPLAINT

CPN Cascade, Inc. ("CPN Cascade"), for its Complaint, states as follows:

1. This is an action against the United States for money damages for breach of contract. The United States is liable to CPN Cascade for $9,000,000 in damages, plus interest, costs and fees.

## PARTIES

2. CPN Cascade is a corporation organized under the laws of the State of Delaware, with its principal place of business in San Jose, California. CPN Cascade is a wholly owned subsidiary of Calpine Corporation ("Calpine"). CPN Cascade is in the business of developing, owning and operating electric generating facilities.

3. The defendant is the United States acting through the Bonneville Power Administration ("Bonneville"), which is an agency within the U.S. Department of Energy.

## JURISDICTION

4. The Court has jurisdiction to render judgment on CPN Cascade's claims under 41 U.S.C. § 609 and 28 U.S.C. § 1491. Bonneville's actions giving rise to CPN Cascade's claims are final and CPN Cascade's claims are ripe for review by this Court.

5. On November 24, 2004, CPN Cascade submitted to Bonneville a certified claim under the Contract Disputes Act, as amended, 41 U.S.C. §§ 601 et seq., requesting that Bonneville pay CPN Cascade $9,000,000. A copy of CPN Cascade's certified claim is attached as Exhibit A.

6. On January 28, 2005, Bonneville denied CPN Cascade's claim. A copy of the letter denying the claim is attached as Exhibit B. Bonneville stated: "If CPN Cascade is dissatisfied with our decision, it may appeal in accordance with 41 U.S.C. §§ 606 and 609."

7. This Complaint is filed in accordance with 41 U.S.C. § 609.

## FACTS

8. In September 1994, CPN Cascade (then d/b/a CE Newberry, Inc) and Bonneville entered into a Power Purchase Agreement for power from a geothermal project at Newberry Volcano in central Oregon ("Newberry PPA"). A dispute arose under the Newberry PPA and CE Newberry, Inc. ("CE Newberry" or "CalEnergy") filed for arbitration seeking damages from Bonneville of more than $40,000,000 for breach of contract.

9. Bonneville and CE Newberry settled the Newberry PPA dispute by entering into a Settlement Agreement on December 6, 1996 (the "Settlement Agreement") whereby Bonneville agreed to make cash payments to CE Newberry (*i.e.*, CPN Cascade), as described in paragraphs 11 and 12 below. In exchange, CE Newberry agreed to release all claims against Bonneville under the Newberry PPA and to negotiate an Amended Power Purchase Agreement for an

alternate geothermal site at Glass Mountain, known as the Telephone Flat Project. Bonneville and CE Newberry would only execute this Amended Power Purchase Agreement upon the satisfaction of certain conditions, including approval of the Telephone Flat Project by Bonneville. A copy of the December 6, 1996 Settlement Agreement (without attachments) is attached as Exhibit A1.

10. Bonneville received good and valuable consideration under the Settlement Agreement. By entering into the Settlement Agreement, Bonneville avoided an expensive and time-consuming arbitration and a potentially very costly arbitration award. CE Newberry released Bonneville from breach of contract claims under the Newberry PPA with claimed damages in excess of $40,000,000. Bonneville determined that a monetary settlement in the range of $18 million to $19 million total was reasonable given the risks it faced. Moreover, Bonneville has acknowledged another benefit of the Settlement Agreement: Bonneville was able to negotiate the Amended Power Purchase Agreement for the Telephone Flat Project with terms and conditions substantially more favorable to Bonneville in the event Bonneville decided to go forward with that project.

11. Section 3.1 of the Settlement Agreement required Bonneville to pay to CE Newberry (*i.e.*, CPN Cascade) a settlement payment of $9,000,000 within 5 business days of the execution of the Settlement Agreement. Bonneville made that payment.

12. The Settlement Agreement also required Bonneville to make one of the following payments. The "Project" referred to in these provisions is the Telephone Flat Project and "CalEnergy" is CE Newberry (*i.e.*, CPN Cascade).

> 3.2 Record of Decision Payment. BPA shall pay CalEnergy $9,000,000 within five (5) business days after the following conditions occur: a) the United States Bureau of Land Management ("BLM") and United States Forest Service ("Forest

> Service") issue Records of Decisions approving the Project (as defined in the Amended and Restated PPA) and all appeals thereof have been settled, withdrawn or dismissed (each a "Final Record of Decision"), AND b) BPA (i) issues a Record of Decision not approving the Project, or (ii) fails to issue any Record of Decision within 120 calendar days after the BLM and Forest Service have each issued a Final Record of Decision, or (iii) does not duly execute the Amended and Restated PPA within 120 calendar days after the BLM and Forest Service each issue a final Record of Decision.
>
> 3.3 Commercial Operation Payment. If BPA issues a Record of Decision approving the Project and executes the Amended and Restated PPA within 120 calendar days after the BLM and Forest Service each issue a Final Record of Decision and the Commercial Operation Date (as defined in the Amended and Restated PPA) is achieved, then BPA shall pay to CalEnergy the sum of $10,000,000 within five (5) business days after the Commercial Operation Date.

13. On May 31, 2000, BLM and Forest Service issued a Record of Decision denying the authorizations needed for the Telephone Flat Project. On October 17, 2000, CE Newberry's affiliate, California Energy General Corporation ("CEGC") initiated an action for money damages against the United States in the U.S. Court of Federal Claims, Case No. 00-619C. CEGC sued on two grounds: (1) that the May 31, 2000 Record of Decision constituted a breach of its Glass Mountain lease contracts; and (2) that the Record of Decision effectuated a taking of CEGC's lease property requiring just compensation under the Fifth Amendment.

14. In October 2001, Calpine Corporation acquired all shares and interests of CEGC and CE Newberry, including all geothermal assets. Calpine changed the name of CEGC to CPN Telephone Flat, Inc. and the name of CE Newberry to CPN Cascade, Inc. CPN Cascade is the successor to CE Newberry as party to the Settlement Agreement, as defined in Section 1 in the Settlement Agreement.

15. On April 4, 2002, the United States and CEGC executed a settlement agreement in the Case No. 00-619C before the Court of Federal Claims. Under that settlement, the

Government agreed to reconsider its Record of Decision for the Telephone Flat Project immediately.

16. After the settlement of Case No. 00-619C, Calpine informed Bonneville that the BLM and Forest Service were reconsidering their May 31, 2000 Record of Decision for the Telephone Flat Project and that a new Record of Decision approving the Telephone Flat Project would trigger Bonneville's payment obligations under Sections 3.2 and 3.3 in the Settlement Agreement.

17. On July 16, 2002, Bonneville sent a letter to Calpine. A copy of the July 16, 2002 letter is attached as Exhibit A2. Bonneville's letter stated that Bonneville's obligations under the Settlement Agreement were fulfilled or extinguished. Bonneville asserted that the issuance of a new Record of Decision approving the Project would not trigger a Bonneville payment obligation under Sections 3.2 or 3.3 of the Settlement Agreement.

18. On July 24, 2002, Calpine responded to Bonneville. In that letter, a copy of which is attached as Exhibit A3, Calpine explained that the issuance of a Final Record of Decision by the BLM and Forest Service approving the project would trigger Bonneville's payment obligations under the Settlement Agreement.

19. On November 26, 2002, the BLM and Forest Service issued a Record of Decision, approving the Telephone Flat Project. A copy of the Record of Decision is attached as Exhibit A4. On April 11, 2003, the Department of Agriculture issued a decision dismissing the last appeal of the November 2002 Record of Decision approving the Project. At that point, the BLM's and Forest Service's Telephone Flat Project Record of Decision became a final Record of Decision. A copy of the Department of Agriculture decision is attached as Exhibit A5.

20. In a July 28, 2003 letter, Calpine informed Bonneville that, when the favorable BLM and Forest Service Record of Decision became a Final Record of Decision, CPN Cascade had fully performed the requirements of Section 3.2 in the Settlement Agreement, and that BPA's obligation to perform under Section 3.2 was triggered. A copy of that letter is Exhibit A6.

21. In an August 8, 2003 letter, Bonneville informed Calpine that it did not agree. A copy of that letter is Exhibit A7.

22. Bonneville failed to issue any Record of Decision or to execute the Amended and Restated Power Purchase Agreement within 120 days after the BLM and Forest Service had issued a Final Record of Decision. Bonneville therefore became contractually liable to pay CPN Cascade $9,000,000 under Section 3.2 of the Settlement Agreement.

23. Bonneville refuses to pay CPN Cascade the $9,000,000 it is owed under the Settlement Agreement. As described in paragraphs 5 and 6 above, Bonneville issued a final decision denying CPN Cascade's claim on January 28, 2005 (Exhibit B).

**COUNT ONE: BREACH OF CONTRACT CLAIM**

24. CPN Cascade incorporates by reference paragraphs 1 through 23 of this Complaint.

25. Bonneville accepted and enjoyed the benefits of the Settlement Agreement. The Settlement Agreement is a contract, binding on both Bonneville and CPN Cascade.

26. Under Section 3.2 of the Settlement Agreement, Bonneville was required to pay CPN Cascade $9,000,000.

27. Defendant United States, through Bonneville's refusal to pay CPN Cascade the $9,000,000 pursuant to Section 3.2 of the Settlement Agreement, has breached the Settlement Agreement.

28. CPN Cascade is entitled to damages from the United States for its breach of contract in the amount of $9,000,000.

## COUNT TWO: CDA CLAIM

29. CPN Cascade incorporates by reference paragraphs 1 through 28 of this Complaint.

30. CPN Cascade is entitled to judgment and payment of $9 million from Defendant under 41 U.S.C. § 609 plus accrued interest under 41 U.S.C. § 611 since November 26, 2004, the date that the Bonneville Contracting Officer received the claim.

## PRAYER FOR RELIEF

CPN Cascade seeks the following relief against the United States:

1. Judgment awarding CPN Cascade damages in the amount of nine million dollars ($9,000,000);

2. Accrued interest pursuant to 41 U.S.C. § 611 and other law;

3. Attorneys fees and costs; and

4. Such other relief as the Court deems appropriate.

Dated December 17, 2005.

Respectfully submitted,

Holland & Hart LLP
8390 East Crescent Parkway, Suite 400
Greenwood Village, CO 80111-2800
Phone: (303) 290-1089
Fax: (303) 290-1606
rbailey@hollandhart.com
CM/ECF User

Matt J. Micheli
Hadassah M. Reimer
Holland & Hart LLP
2515 Warren Avenue, Suite 450
Cheyenne, WY 82001
Phone: (307) 778-4200
Fax: (307) 778-8175
mmicheli@hollandhart.com
dmreimer@hollandhart.com

**ATTORNEYS FOR PLAINTIFF**

3457918_3.DOC

# EXHIBIT A

Perkins Coie

1201 Third Avenue, Suite 4800
Seattle, WA 98101-3099
PHONE: 206.583.8888
FAX: 206.583.8500
www.perkinscoie.com

Richard W. Oehler
PHONE: 206.359.8419
FAX: 206.359.9419
EMAIL: ROehler@perkinscoie.com

November 24, 2004

***BY EXPRESS COURIER***

Ms. Debra Malin
Account Executive PT-5
Bonneville Power Administration
905 NE 11th Avenue
Portland, OR 97208-3621

**Re: Telephone Flat/Glass Mountain Geothermal Project/Settlement Agreement**

Dear Ms. Malin:

We are counsel to CPN Cascade, Inc. ("CPN Cascade") and its parent corporation, Calpine Corporation. Under the above-referenced contract, we submit on behalf of CPN Cascade a certified claim under the Contract Disputes Act, as amended, 41 U.S.C. §§ 601 <u>et seq</u>. ("CDA"). Pursuant to this claim, CPN Cascade requests that Bonneville Power Administration ("Bonneville") pay to CPN Cascade the sum of $9 million.

CPN Cascade respectfully requests a final decision from the Contracting Officer within sixty (60) days of receipt of this claim. <u>See</u> 41 U.S.C. § 605(c)(2).

**A. BACKGROUND AND SUMMARY OF DISPUTE**

In September 1994, CPN Cascade's predecessor, CE Newberry, Inc. ("CE Newberry" or "CalEnergy") and Bonneville entered into a Power Purchase Agreement. Subsequently, a dispute arose with regard to the Power Purchase Agreement which the parties settled by execution of a December 6, 1996 Settlement Agreement (the "Settlement Agreement"). A copy of this Settlement Agreement (without attachments) is attached as Exhibit 1.



ANCHORAGE · BEIJING · BELLEVUE · BOISE · CHICAGO · DENVER · HONG KONG · LOS ANGELES
MENLO PARK · OLYMPIA · PORTLAND · SAN FRANCISCO · SEATTLE · SPOKANE · WASHINGTON, D.C.
Perkins Coie LLP (Perkins Coie LLC in Illinois)

EXHIBIT
A

Section 3.2 in the Settlement Agreement provides as follows:

> 3.2 ROD Payment. BPA shall pay CalEnergy $9,000,000 within five (5) business days after the following conditions occur: a) the United States Bureau of Land Management ("BLM") and United States Forest Service ("Forest Service") issue Records of Decisions approving the Project (as defined in the Amended and Restated PPA) and all appeals thereof have been settled, withdrawn or dismissed (each a "Final ROD"), AND b) BPA (i) issues a Record of Decision not approving the Project, or (ii) fails to issue any Record of Decision within 120 calendar days after the BLM and Forest Service have each issued a Final ROD, or (iii) does not duly execute the Amended and Restated PPA within 120 calendar days after the BLM and Forest Service each issue a final ROD.

Section 3.3 in the Agreement provides as follows:

> 3.3 Commercial Operation Payment. If BPA issues a Record of Decision approving the Project and executes the Amended and Restated PPA within 120 calendar days after the BLM and Forest Service each issue a Final ROD and the Commercial Operation Date (as defined in the Amended and Restated PPA) is achieved, then BPA shall pay to CalEnergy the sum of $10,000,000 within five (5) business days after the Commercial Operation Date.

The Project referenced in Sections 3.2 and 3.3 is the Telephone Flat/Glass Mountain Geothermal Development Project (the "Telephone Flat Project" or the "Project"). The Project is to be developed on federal geothermal leases held by CE Newberry's affiliate, California Energy General Corporation ("CEGC"), now d/b/a CPN Telephone Flat, Inc., in the Telephone Flat area within the Glass Mountain Known Geothermal Resource Area ("KGRA") in Northern California. The United States Bureau of Land Management ("BLM") administers the leases and the U.S. Forest Service ("FS") administers the national forest lands in the Project area.

On May 31, 2000, BLM and FS issued a ROD denying the authorizations needed for the Project. On October 17, 2000, CEGC initiated an action for money damages against the United States in the U.S. Court of Federal Claims ("COFC"). CEGC sued on two grounds: (1) that the May 31, 2000 ROD constituted a breach of its Glass

Mountain lease contracts; and (2) that the ROD effectuated a taking of CEGC's lease property requiring just compensation under the Fifth Amendment.

In October 2001, Calpine Corporation acquired all shares and interests of CEGC and CE Newberry, including all geothermal assets. Calpine changed the name of CEGC to CPN Telephone Flat, Inc. and the name of CE Newberry to CPN Cascade, Inc. CPN Cascade is the successor to CE Newberry as party to the Settlement Agreement, as defined in Section 1 in the Settlement Agreement.

On April 4, 2002, the United States and CEGC executed a settlement agreement in the COFC litigation. Under the settlement, the Government agreed to initiate immediately a reconsideration of its ROD for the Project.

After execution of the COFC settlement agreement, Calpine informed Bonneville that the BLM and FS were reconsidering their May 31, 2000 ROD for the Project and that a new ROD approving the Project would trigger Bonneville's payment obligations under Sections 3.2 and 3.3 in the Settlement Agreement.

On July 16, 2002, Bonneville sent a letter to Calpine. A copy of the July 16, 2002 letter is attached as Exhibit 2. Bonneville's letter states that Bonneville's obligations under its December 6, 1996 Settlement Agreement with CPN Cascade's predecessor are fulfilled or extinguished. More specifically, Bonneville asserts that the issuance of a new ROD approving the Project would not trigger a Bonneville payment obligation under Sections 3.2 and 3.3 of the Settlement Agreement.

In response, Calpine sent to Bonneville a July 24, 2002 letter, a copy of which is attached as Exhibit 3. In that letter, Calpine explained that the issuance of a Final ROD by the BLM and FS, approving the project, would trigger Bonneville's payment obligations under the Settlement Agreement.

On November 26, 2002, the BLM and FS issued a ROD, approving the Telephone Flat Project. A copy of the ROD is attached as Exhibit 4. On April 11, 2003, the Department of Agriculture issued a decision, dismissing the last appeal of the November 2002 ROD approving the Project. At that point, the BLM's and FS's

Telephone Flat Project ROD became a Final ROD. A copy of the Department of Agriculture decision is attached as Exhibit 5.[1]

In a July 28, 2003 letter, Calpine informed Bonneville that, with the favorable BLM and FS ROD becoming a Final ROD, CPN Cascade had fully performed the requirements of Section 3.2 in the Settlement Agreement, and that BPA's obligation to perform under Section 3.2 was triggered.[2] A copy of that letter is Exhibit 6. In an August 8, 2003 letter, Bonneville informed Calpine that it did not agree. A copy of that letter is Exhibit 7.

## B. CPN CASCADE'S CLAIM

Section 3.2 provides that, when the BLM and FS issue a ROD approving the Telephone Flat Project and all appeals have been settled, withdrawn or dismissed such that the ROD becomes a Final ROD, Bonneville has 120 days to issue a ROD approving the Project and to execute the Amended and Restated Power Purchase Agreement with CPN Cascade for Telephone Flat. If Bonneville does not take either of these actions within this 120 day period, Bonneville then must pay the sum of $9 million to CPN Cascade.

The conditions triggering Bonneville's $9 million payment obligation have all occurred. The BLM and FS issued a ROD, approving the Telephone Flat Project on November 26, 2002. That ROD became a Final ROD on April 11, 2003 when the Department of Agriculture dismissed the last appeal of the Telephone Flat ROD. Bonneville failed to issue a ROD, approving the Telephone Flat Project, and to execute the Amended and Restated Power Purchase Agreement with CPN Cascade for Telephone Flat within 120 days thereafter.

Bonneville asserts that its obligations under the Settlement Agreement were extinguished following the August 31, 2000 Regional Forester's appeal decision affirming the May 31, 2000 ROD, and initially denying the Telephone Flat Project.

---

[1] In the Department of the Interior, the Assistant Secretary–Land and Minerals Management in the Department of the Interior issued the November 26, 2002 ROD on behalf of BLM, and there were no appeals of the ROD.

[2] This Calpine letter was incorrectly dated June 28, 2003.

Bonneville's assertion is ill-founded. Section 3.2 neither states that BLM and FS have to approve the Project on their first consideration of the ROD nor contains a time limit within which the agencies must issue a favorable ROD. Instead, the Settlement Agreement provides that, once the BLM and FS issue a Final ROD, approving the Project, Bonneville's obligations under Section 3.2 in the Agreement are triggered.

In sum, the only reasonable interpretation of the Settlement Agreement is that Bonneville now owes to CPN Cascade the sum of $9 million.

## C. CDA CERTIFICATION AND CDA INTEREST

We attach to this letter the certification required by the CDA. CPN Cascade also requests interest on its claim as provided for in the CDA.

If you have any questions, please feel free to contact me.

Very truly yours,

Richard W. Oehler

Richard W. Oehler

RWO:pmr
Attachments
cc: Stephen J. Wright

List of Attachments

Claim Certification

Exhibits:

1. December 6, 1996 Settlement Agreement
2. July 16, 2002 Bonneville Letter
3. July 24, 2002 Calpine Letter
4. November 26, 2002 BLM and FS Tel. Flat ROD
5. April 11, 2003 Dept. of Agriculture Decision
6. July 28, 2003 Calpine Letter
7. August 8, 2003 Bonneville Letter

## CERTIFICATION

I certify that the claim is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the Contractor believes the Government is liable; and that I am duly authorized to certify the claim on behalf of the Contractor.

11/22/04

Richard L. Thomas, Vice President
Calpine Corporation on behalf of
CPN Cascade, Inc.

# EXHIBIT A1

# SETTLEMENT AGREEMENT

THIS SETTLEMENT AGREEMENT (this "Agreement") dated as of December 6, 1996 ("Effective Date") is made by and between Bonneville Power Administration ("BPA") and CE Newberry, Inc. ("CalEnergy").

WHEREAS, BPA and CalEnergy are parties to a Power Purchase Agreement ("PPA") dated September 16, 1994.

WHEREAS, a genuine controversy exists between BPA and CalEnergy.

NOW THEREFORE, in consideration of the mutual covenants, agreements, and obligations and subject to the terms and conditions set forth herein, the Parties agree as follows:

1. <u>Definitions</u>. Capitalized terms not defined herein shall have the following meanings:

"Amended and Restated PPA" means the Amended and Restated Power Purchase Agreement in substantially the form as attached hereto as Exhibit A.

"BPA" means Bonneville Power Administration and its successors and assigns.

"CalEnergy" means CE Newberry, Inc. and its successors and assigns.

"Commercial Operation Payment" means a payment of $10,000,000 by BPA to CalEnergy upon Commercial Operation Date as defined in the Amended and Restated PPA.

"Effective Date" means the date this Agreement is executed by the Parties.

"Newberry PPA" means the existing Power Purchase Agreement between BPA and CalEnergy dated September 16, 1994.

"Party" or "Parties" means BPA or CalEnergy, and "Parties" means both BPA and CalEnergy, as the context requires.

"Released Claims" means both the Released BPA Claims and the Released CalEnergy Claims.

"Released BPA Claims" means any and all manner of action or actions, cause or causes of action, in law or in equity, suits, debts, liens, contracts, agreements, promises, liability, claims, demands, damages, loss, cost or expense, of any nature whatsoever, known or unknown, fixed or contingent, but solely to the extent related to CalEnergy's performance pursuant to the Newberry PPA.

EXHIBIT A1

"Released CalEnergy Claims" means any and all manner of action or actions, cause or causes of action, in law or in equity, suits, debts, liens, contracts, agreements, promises, liability, claims, demands, damages, loss, cost or expense, of any nature whatsoever, known or unknown, fixed or contingent, but solely to the extent related to BPA's performance pursuant to the Newberry PPA.

"ROD Payment" means a payment by BPA to CalEnergy in the amount of $9,000,000 pursuant to Section 3.2.

"Settlement Payment" means a payment of $9,000,000 by BPA to CalEnergy within five (5) business days following the execution of this Agreement by the Parties.

2. Release of Claims.

2.1 Release. On behalf of their respective affiliates, successors, and assigns, (i) BPA hereby fully and forever releases and discharges CalEnergy and each of its affiliates, associates, owners, stockholders, predecessors, successors, agents, directors, officers, partners, employees, representatives, lawyers, and all persons acting by, through, under or in concert with them, or any of them, from any and all Released BPA Claims, and (ii) CalEnergy hereby fully and forever releases and discharges BPA and each of its successors, agents, officers, employees, representatives, lawyers, and all persons acting by, through, under or in concert with them, or any of them, from any and all Released CalEnergy Claims. The Parties intend for this Agreement to constitute a complete resolution between the Parties of their dispute with respect to the Released Claims, and the Parties agree that in consideration of the Settlement Payment that such releases will be effective and enforceable even where a court of competent jurisdiction voids this Agreement in whole or in part.

2.2 Claims Under this Agreement and the Amended and Restated PPA. The releases in Section 2.1 apply only to the Released Claims and shall not apply to any claims, demands, obligations, responsibilities, suits, actions or causes of action arising out of the failure of any Party to perform its obligations as set forth in this Agreement or that may arise under the Amended and Restated PPA after its execution.

2.3 Not an Admission. It is understood that this Agreement does not constitute an admission of any liability by either Party, but is a compromise of disputed claims. Each Party hereby declares and represents that it is executing this Agreement after consultation with its own legal counsel.

3. Covenants.

3.1 Settlement Payment. BPA shall pay to CalEnergy the Settlement Payment within five (5) business days after the Effective Date.

3.2 ROD Payment. BPA shall pay CalEnergy $9,000,000 within five (5) business days after the following conditions occur: a) the United States Bureau of



s:\legal\bpscen7.set

Land Management ("BLM") and United States Forest Service ("Forest Service") issue Records of Decisions approving the Project (as defined in the Amended and Restated PPA) and all appeals thereof have been settled, withdrawn or dismissed (each a "Final ROD"), AND b) BPA (i) issues a Record of Decision not approving the Project, or (ii) fails to issue any Record of Decision within 120 calendar days after the BLM and Forest Service have each issued a Final ROD, or (iii) does not duly execute the Amended and Restated PPA within 120 calendar days after the BLM and Forest Service each issue a Final ROD.

3.3 <u>Commercial Operation Payment</u>. If BPA issues a Record of Decision approving the Project and executes the Amended and Restated PPA within 120 calendar days after the BLM and Forest Service each issue a Final ROD and the Commercial Operation Date (as defined in the Amended and Restated PPA) is achieved, then BPA shall pay to CalEnergy the sum of $10,000,000 within five (5) business days after the Commercial Operation Date.

3.4 <u>Execution of Amended and Restated PPA</u>. CalEnergy acknowledges that BPA must comply with the National Environmental Policy Act ("NEPA") prior to making a final decision whether to approve the Project and execute the Amended and Restated PPA. If BPA issues a Record of Decision approving the Project and authorizing the execution of the Amended and Restated PPA, BPA shall execute the Amended and Restated PPA within three (3) business days thereafter.

3.5 <u>Drilling Report</u>. Within thirty (30) calendar days after BPA executes this Agreement, CalEnergy shall deliver to BPA a written report containing the all drilling, geologic, and economic data (aggregate per well) related to the Newberry project. CalEnergy hereby agrees to the release of the report to the public.

3.6 <u>Lease Carrying Costs</u>. CalEnergy shall not relinquish control over leases OR45505, OR45506, OR47297, OR47299, OR47300, OR47302 and OR47305 for a period of at least 5 years from the Effective Date, and BPA shall reimburse CalEnergy a total of $10,000 per year or one-half of five annual carrying costs for such leases, whichever is less. Such reimbursement shall occur as the lease carrying costs are next due after execution of this Agreement. CalEnergy shall submit an invoice for such reimbursement according to the Billing and Payment provision in the Amended and Restated PPA.

3.7 <u>Right of First Refusal</u>. BPA and the Eugene Water and Electric Board (EWEB) will have a right of first refusal to purchase the electrical output generated by CalEnergy from any geothermal power project developed at the Newberry project site by CalEnergy, or any of its successors or assigns, for the 5-year period described in subsection 3.6 including extensions thereof.

3.8 <u>Research</u>. CalEnergy shall, at no cost to itself, make the Newberry project site available to universities and governmental agencies for scientific research purposes.

3.9 Other Projects. CalEnergy shall not take any action against 'onneville or any geothermal pilot project developer, including but not limited to the filing of any lawsuit, that will obstruct, delay, or prevent the negotiation or contracting with Bonneville for any other Bonneville project under Bonneville's geothermal pilot project program; provided, however, that this provision shall not prevent CalEnergy from (1) taking any action against Bonneville it deems necessary to protect its rights under this Agreement or the Amended and Restated PPA, or (2) taking any action to protect CalEnergy's rights related to its development, permitting, construction, operations, or lease holdings at Glass Mountain, California.

4. Representations and Warranties of CalEnergy. To induce BPA to waive the Released Claims as of the Effective Date, and to pay the consideration described in Section 3.1 hereof, CalEnergy represents and warrants that, as of the date hereof:

(a) CalEnergy is a corporation duly organized and validly existing under the laws of the State of Delaware and has full power and authority to execute and deliver this Agreement;

(b) CalEnergy has obtained all authorizations necessary to execute, deliver and perform the transactions contemplated herein;

(c) This Agreement constitutes CalEnergy's valid and legally binding obligation and is enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws of general application;

(d) Neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated hereby, will violate or conflict with any provision of law, regulation or order of any court or other agency of government, the Articles of Incorporation of CalEnergy, or any indenture, agreement or other instrument to which CalEnergy may be a party, or by which it may be bound, or be in conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under or result in the creation or imposition of any lien, charge or encumbrance of any nature whatsoever, upon any of its property or assets pursuant to any such indenture, agreement or instrument; and

(e) CalEnergy has neither assigned nor transferred, voluntarily, involuntarily by operation of law or otherwise any rights, claims or causes of action against BPA arising out of, or related to, the Released Claims to a third party.

5. Representations and Warranties of BPA. To induce CalEnergy to waive the Released Claims as of the Effective Date, BPA represents and warrants that, as of the date hereof:

(a) BPA is a power marketing agency of the United States Government, Department of Energy, validly existing and in good standing under

Federal law and has all requisite power and authority to execute and perform this Agreement and its obligations hereunder.

(b) BPA has the authorization necessary to execute, deliver and perform the transactions contemplated herein;

(c) This Agreement constitutes BPA's valid and legally binding obligation and is enforceable against BPA in accordance with its terms, except as enforcement may be limited by law;

(d) Neither the execution and delivery of this Agreement or the Amended and Restated PPA, nor the consummation of the transactions contemplated hereby, will violate or conflict with any provision of law, regulation or order of any court or other agency of government, the organizational documents of BPA, or any indenture, agreement or other instrument to which it may be a party, or by which BPA may be bound, or be in conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under or result in the creation or imposition of any lien, charge or encumbrance of any nature whatsoever, upon any of the property or assets of BPA pursuant to any such indenture, agreement or instrument; and

(e) BPA has neither assigned nor transferred, voluntarily, involuntarily by operation of law or otherwise any rights, claims or causes of action against CalEnergy arising out of, or related to, the Released Claims to a third party.

6. <u>Events of Default and Remedies</u>.

6.1 The occurrence of any of the following events shall constitute an "Event of Default" hereunder:

(a) Any representation or warranty made herein by BPA or CalEnergy or in any report, certificate or other instrument furnished in connection with this Agreement, proves to be false or misleading in any material respect;

(b) Failure of BPA or CalEnergy to perform their respective obligations under Section 3 hereof;

6.2 If both Parties agree that an Event of Default has occurred, the non-defaulting Party may proceed to exercise any remedy provided under this Agreement or existing at law or in equity. If one Party believes in good faith that no Event of Default has occurred and promptly informs the Party asserting the existence of the Event of Default of this belief, the Parties shall enter negotiations in an attempt to resolve the dispute; <u>provided, however</u>, if either Party believes in good faith that a negotiated resolution to the dispute is unlikely, that Party may proceed to exercise any and all remedies available under this Agreement or existing at law or in equity.

7. Payment Provisions.

7.1 BPA shall make all payments required under this Agreement by wire transfer to the following CalEnergy account:

Bank of America, San Francisco
ABA#121000358
Acct. #00434 10922

as directed by CalEnergy in writing.

7.2 BPA's obligation to make the payments described in this Agreement shall not be subject to any claim, set-off counter-claim or other claim that BPA may have against CalEnergy or any other person arising out of any matter unrelated to this Agreement.

8. Cooperation. The Parties shall actively participate in the Environmental Impact Statement/Environmental Impact Report to be undertaken by the BPA, BLM and Forest Service with respect to the Project and the related California Environmental Quality Act, Endangered Species Act and similar processes and cooperate with each other, the BLM, the Forest Service and the public to complete the NEPA process including, without limitation, expediting the process by consolidating meetings, hearings, mandatory processes and documents whenever practical.

9. Successors and Assigns. Neither Party shall voluntarily assign its rights nor delegate its duties under this Agreement without the prior written consent of the other Party. Any assignment or delegation made without such written consent shall be null and void. A consent for assignment shall not be unreasonably withheld. Subject to the foregoing, this Agreement shall be binding on and shall inure to the benefit of BPA and CalEnergy and their respective successors and assigns.

10. Indemnification. Each Party agrees to indemnify, hold harmless and defend the other Party from and against all liabilities, obligations, losses, claims, lawsuits, damages, injuries, costs, expenses and other detriments whatsoever, including without limitation, all consequential damages and reasonable attorneys' fees, arising out of or incident to claims asserted by third parties to the effect that such third parties are damaged by the performance under this Agreement by such indemnifying Party. The indemnities and assumptions of liabilities and obligations herein provided for shall continue in full force and effect notwithstanding the expiration or termination of this Agreement.

11. Several Obligations. Except where specifically stated in this Agreement to be otherwise, the duties, obligations, and liabilities of the Parties are intended to be several and not joint or collective. Nothing contained in this Agreement shall be construed to create an association, trust, partnership, or joint venture or impose a trust

or partnership duty, obligation, or liability on or with regard to either Party. Each Party shall be liable individually and severally for its own obligations under this Agreement.

12. Notices. All notices, requests, demands and other communications which are required or may be given under this Agreement shall be provided in writing and shall be deemed to have been given if telecopied (receipt verified) or mailed by United States certified or registered mail, return receipt requested, postage prepaid, or sent by nationally recognized overnight courier, charges prepaid, as follows:

If to BPA:

Bonneville Power Administration
Attn: Mr. George Darr - PGC
P.O. Box 3621
Portland, OR 97208
(503) 230-7405 (Fax)

If to CalEnergy:

CE Newberry, Inc.
Attn: General Counsel
302 South 36th Street, Suite 400
Omaha, NE 68131
(402) 231-1658 (Fax)

All such communications shall be deemed to have been duly given when transmitted by telecopies or, in the case of a mailed notice or notice sent by overnight courier upon receipt, in each case given or addressed as set forth above.

13. Governing Law. This Agreement shall be interpreted, construed and governed by Federal law.

14. Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

15. Headings. The Section headings contained in this Agreement are solely for the purpose of reference, are not part of the agreement of the Parties, and shall not in any way affect the meaning or interpretation of this Agreement. All references in this Agreement to Sections are Sections of this Agreement, unless otherwise indicated. Each of the Parties hereto and their respective counsel have contributed to the preparation of this Agreement. Accordingly, no provision of this Agreement shall be construed against any Party because that Party or its counsel drafted the provision.

16. No Waiver. It is understood and agreed that no failure or delay by any Party hereto in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or future exercise thereof or the exercise of any other right, power or privilege.

17. Miscellaneous. This Agreement sets forth the entire understanding and agreement between the Parties with reference to the subject matter hereof and may not

be modified or terminated except by an instrument in writing signed by BPA and CalEnergy. If any provision of this Agreement is held to be unenforceable against any Party for any reason, this Agreement shall be adjusted rather than voided, if possible, to achieve the intent of the Parties to the fullest extent possible and all other provisions of this Agreement shall be deemed valid and enforceable to the fullest extent possible. If either Party shall refer this Agreement to an attorney in connection with a dispute hereunder in order to assist in its interpretation or enforcement, the prevailing Party in such dispute shall be entitled to an award of its costs and fees (including reasonable attorney fees) incurred in connection with the dispute.

IN WITNESS WHEREOF, intending to be legally bound, the Parties hereto have duly executed this Agreement as of the date first set forth above.

BONNEVILLE POWER ADMINISTRATION

By: [signature]
Name: J. R. Lewis
Title: Manager, Contract Generating Resources

CE NEWBERRY, INC.

By: [signature]
Name: Robert S. Silberman
Title: Senior Vice President

be modified or terminated except by an instrument in writing signed by BPA and CalEnergy. If any provision of this Agreement is held to be unenforceable against any Party for any reason, this Agreement shall be adjusted rather than voided, if possible, to achieve the intent of the Parties to the fullest extent possible and all other provisions of this Agreement shall be deemed valid and enforceable to the fullest extent possible. If either Party shall refer this Agreement to an attorney in connection with a dispute hereunder in order to assist in its interpretation or enforcement, the prevailing Party in such dispute shall be entitled to an award of its costs and fees (including reasonable attorney fees) incurred in connection with the dispute.

IN WITNESS WHEREOF, intending to be legally bound, the Parties hereto have duly executed this Agreement as of the date first set forth above.

BONNEVILLE POWER ADMINISTRATION

By: J. R. Lewis

Name: J. R. Lewis

Title: Manager, Contract Generating Resources

CE NEWBERRY, INC.

By:____________________

Name:____________________

Title:____________________

# EXHIBIT A2

**Department of Energy**
Bonneville Power Administration
P.O. Box 3621
Portland, Oregon 97208-3621

In reply refer to: PT/5

Sent via fax

July 16, 2002

CPN Cascade, Inc.
C/o Calpine Corporation
50 West San Fernando St.
San Jose, CA 95113
Attn: Mr. Mark Said, General Counsel

Re: Settlement Agreement between Bonneville Power Administration and CE Newberry, Inc.

Dear Mr. Said:

The Bonneville Power Administration (BPA) hereby notifies the Calpine Corporation (Calpine) that all of BPA's obligations under the December 6, 1996, Settlement Agreement between BPA and CE Newberry, Inc. (Agreement) have been fulfilled or extinguished.

The Agreement contained three principal obligations:

1. In section 3.1 of the Agreement, BPA agreed to pay CalEnergy a Settlement Payment of $9 million within 5 business days after the Effective Date. The payment was made by BPA in accord with the Agreement.

2. In sections 3.5, 3.6, and 3.8, the Parties agreed to share costs related to the maintenance of the Newberry leases for a period of 5 years after the Effective Date. CalEnergy also agreed to deliver a written report on the Newberry project and to make the Newberry project site available for scientific research purposes. The 5-year period ended on December 6, 2001, and all payments and other obligations were performed by the Parties.

3. In section 3.2 of the Agreement, BPA agreed to pay CalEnergy $9 million within 5 business days after the following conditions occur: a) the United States Bureau of Land Management (BLM) and United States Forest Service (Forest Service) issue Records of Decisions approving the Project (the Telephone Flat Geothermal Project) and all appeals thereof have been settled, withdrawn or dismissed (each a "Final ROD"), AND b) BPA (i) issues a Record of Decision not approving the Project, or (ii) fails to issue any Record of Decision within 120 calendar days after the BLM and Forest Service have each issued a Final ROD, or (iii) does not duly execute the

EXHIBIT
tabbies
A2

Amended and Restated PPA within 120 calendar days after the BLM and Forest Service each issue a Final ROD.

If BPA issued a Record of Decision approving the Project and executed the Amended and Restate PPA within 120 calendar days after the BLM and Forest Service each issued a final ROD and the Commercial Operation Date was achieved, then under section 3.3 of the Agreement, BPA agreed to pay to CalEnergy $10 million within 5 business days after the Commercial Operation Date.

On May 31, 2000, the BLM and Forest Service issued a joint ROD that denied CalEnergy's Plan of Operation and Special Use Application for Development, Injection, Utilization and associated ancillary improvements, such as roads and electrical transmission line for the Telephone Flat Geothermal Projects.

On July 17, 2000, CalEnergy appealed the BLM and Forest Service ROD denying the Telephone Flat Geothermal Project.

On August 31, 2000, the Regional Forester's office denied CalEnergy's appeal and affirmed the Modoc National Forest's decision to deny the Telephone Flat Geothermal Project. The ruling by the Regional Forester constituted the final determination by the Department of Agriculture. CalEnergy did not appeal that decision to the courts. Approval by the Forest Service was necessary for the Telephone Flat project to proceed. As a result, BPA's obligation pursuant to section 3.2 of the Agreement was extinguished.

On October 17, 2000, CalEnergy filed a complaint in the United States Court of Federal Claims, asserting that the BLM and Forest Service ROD "prevents CalEnergy from exercising its contractual property rights to develop and utilize the geothermal resources included in the CalEnergy leases" and seeking damages in excess of $50 million. That action is a claim for damages based on a breach of contract and a takings of property; it does not legally challenge the integrity of the ROD of May 31, 2000.

CalEnergy (which is now a subsidiary of Calpine) and the United States executed an agreement on April 4, 2002, in which the Government agreed to initiate reconsideration of the ROD denying the Telephone Flat Project. Representatives of Calpine have stated their belief that a new ROD approving the Telephone Flat Project would revive BPA's payment obligations under sections 3.2 and 3.3 of the Agreement.

BPA received a letter from Calpine dated March 13, 2002, notifying BPA that Calpine had acquired CE Newberry, Inc., from MidAmerican Energy Holdings Company.

The assertions of Calpine's representatives are in error. BPA's obligations under the Settlement were extinguished following the ROD of August 31, 2000, affirming the ROD of May 31, 2000, that denied CalEnergy's application to construct a power plant at the Telephone Flat site.

Please contact me at 503-230-4386 or my attorney, Mr. Tim Johnson, at 503-230-5285 if you would like to discuss this matter.

Sincerely,

George D. Darr

George D. Darr, P.E.
Manager, Renewable Resource Program

cc:

John Miller, Calpine
Jack Pigott, Calpine

CPN Cascade, Inc.
C/o Calpine Corporation
10350 Socrates Mine Road
Middletown, CA 95461
Attn: Land Manager

# EXHIBIT A3

CALPINE

WESTERN REGION OFFICE
4160 DUBLIN BOULEVARD
DUBLIN, CALIFORNIA 94568
925.479.6600
925.479.7300 (fax)

July 24, 2002

Mr. George D. Darr
Manager, Renewable Resource Program
Bonneville Power Administration
P.O. Box 3621
Portland, OR 97208-3621
Attn: PT/5

**Re: Telephone Flat/Settlement Agreement between BPA and CE Newberry, Inc.**

Dear Mr. Darr:

This responds to BPA's July 16, 2002 letter. In that letter, BPA informed Calpine that BPA believes that all of BPA's obligations under the December 6, 1996 Settlement Agreement between BPA and CE Newberry, Inc. with regard to the Telephone Flat Project ("the Project") have been fulfilled or extinguished.

Calpine has acquired the interests of CE Newberry, Inc., and responds on its behalf. Calpine respectfully disagrees with BPA's assertion that BPA has fulfilled all of its obligations under the Agreement. Section 3.2 of the Agreement provides as follows:

> 3.2 ROD Payment. BPA shall pay CalEnergy $9,000,000 within five (5) business days after the following conditions occur: a) the United States Bureau of Land Management ("BLM") and United States Forest Service ("Forest Service") issue Records of Decisions approving the Project (as defined in the Amended and Restated PPA) and all appeals thereof have been settled, withdrawn or dismissed (each a "Final ROD"), AND b) BPA (i) issues a Record of Decision not approving the Project, or (ii) fails to issue any Record of Decision within 120 calendar days after the BLM and Forest Service have each issued a Final ROD, or (iii) does not duly execute the Amended and Restated PPA within 120 calendar days after the BLM and Forest Service each issue a Final ROD.

EXHIBIT
A3

As Bonneville knows, BLM and the Forest Service are currently reconsidering their Telephone Flat Project Record of Decision ("ROD"). If they should issue a ROD approving the Project and all appeals have been settled withdrawn or dismissed, then Bonneville's obligations under Section 3.2 are triggered.

In its July 16, 2002 letter, BPA asserts that its obligations under Section 3.2 are extinguished because the May 31, 2000 ROD of BLM and the Forest Service disapproved the Project; the Regional Forester affirmed that decision; and Calpine did not appeal that decision to the courts.

BPA's proffered interpretation of Section 3.2 is unreasonable. That provision does not state that BLM and the Forest Service have to approve the Project on their first consideration of the ROD. Section 3.2 also does not contain a time limit within which BLM and the Forest Service must issue a favorable ROD. It also does not state that Bonneville's obligations under this provision extinguish. Bonneville is attempting to read into Section 3.2 additional conditions for its obligations which are not stated in that provision.

Calpine will take all appropriate steps to enforce the rights of CE Newberry under the Agreement. We would happy to meet with Bonneville's representatives to discuss this matter further.

Very truly yours,

CALPINE CORPORATION

Mark C. Said
Regional Counsel

bc: John Miller
Joel Brown
Jack Pigott
Rick Oehler, Perkins Coie

# EXHIBIT A4

# RECORD OF DECISION

## TELEPHONE FLAT GEOTHERMAL DEVELOPMENT PROJECT

## ON

## FEDERAL LEASES
## CA 12370, CA 12371, CA 12372, CA 13803, CA 21933, and CA 2500

## DEPARTMENT OF THE INTERIOR
## BUREAU OF LAND MANAGEMENT
## ALTURAS FIELD OFFICE

## and

## DEPARTMENT OF AGRICULTURE
## FOREST SERVICE
## MODOC NATIONAL FOREST

## MODOC AND SISKIYOU COUNTIES
## CALIFORNIA

## I. INTRODUCTION

This document, prepared by the Bureau of Land Management (BLM) and the Forest Service (FS), is the Record of Decision (ROD) for the Telephone Flat Geothermal Development Project. This ROD is prepared in accordance with the National Environmental Policy Act (NEPA) and Title 40 of the Code of Federal Regulations (CFR), Chapter V, in part.

In 1997, CalEnergy Corporation submitted a Plan of Operation and Special Use Application for the development of geothermal resources on and off Federal leases located within the Glass Mountain Known Geothermal Resource Area (KGRA). In February 1999, the BLM and the FS, in cooperation and partnership with Bonneville Power Administration (BPA), and Siskiyou County Air Pollution Control District, released the *Telephone Flat Geothermal Development Project Final Environmental Impact Statement/ Final Environmental Impact Report* (FEIS/FEIR*)*. The Plan of Operation or Proposed Action consisted of a proposed power plant site and well field, and an Alternative Transmission Line Route 1 (segments D-1 and A-2) as shown on Figure ES-9 and ES-11 in the Executive Summary, and on Figure 2.2.10 and Figure

EXHIBIT
A4

2.2.18 in the FEIS/FEIR. Two other power plant locations, sites A and B, and a second transmission route, Alternative Transmission Line Route 2 (segments D-2 and B-2) were also analyzed in the FEIS/FEIR. The Preferred Alternative disclosed in the FEIS/FEIR was to approve the Project. A ROD denying the Proposed Action was signed by the BLM and the FS in May 2000.

In October 2000, the project proponent (CalEnergy) filed law suit against the BLM and the FS in the U.S. Court of Federal Claims for the denial of the Telephone Flat Geothermal Development Project alleging breach of contract and takings claims. In November 2001, CalEnergy was acquired by Calpine Corporation (Calpine). During the course of litigation, a National Energy Policy was issued that encourages the BLM and FS to reassess domestic sources of renewable energy. In April 2002, Calpine and the United States entered into an agreement to stay the litigation and to provide the BLM and the FS an opportunity to reassess their decision denying the Telephone Flat Geothermal Development Project. This ROD is the culmination of that reconsideration process and replaces and supercedes the previous ROD dated May 31, 2000.

## II. DECISION

After careful reconsideration of all perspectives and factors, including consultation with area tribes, balancing the need for renewable energy with the need to protect visual resources and traditional cultural values and practices associated within the Medicine Lake Highlands, we have concluded that the overall interests of the public would be best served by reversing the earlier decision, selecting the Proposed Action (proposed power plant site) with the modification of selecting Alternative Transmission Line Route 2 (segment D-2 and B-2) instead of Alternative Transmission Line Route 1. This Proposed Action, as modified, is now the Telephone Flat Geothermal Development Project, as Amended (the Project). It is our decision to approve the Project, as amended by this ROD. All mitigation measures identified within the FEIS/FEIR for the Project are considered part of this ROD and can be found in the FEIS/FEIR.

As part of this decision, the Project is further amended by incorporating additional Permit Conditions of Approval (COA) and Agency Commitments which are based on the principles within the Memorandum of Agreement (MOA) made part of the ROD for the approved Fourmile Hill Geothermal Development Project located approximately 6 miles to the northwest of this Project and adjacent to the Medicine Lake Highlands. The Fourmile Hill MOA was developed by the BLM and the FS in consultation with the Klamath Tribes, Pit River Tribe, Shasta Nation, Shasta Tribe Incorporated, the Modoc Tribe of Oklahoma (collectively, Tribes), and in discussion with the Native Coalition for Cultural Restoration of Mount Shasta and Medicine Lake Highlands Defense (Coalition), the Advisory Council on Historic Preservation (ACHP), the California State Historic Preservation Officer (SHPO), Calpine and the BPA to minimize the effects of the Fourmile Hill Geothermal Development Project on historic properties in and adjacent to the Medicine Lake Highlands.

Through the government-to-government consultation process for the Telephone Flat Geothermal Development Project, as Amended, the BLM and the FS proposed to the Tribes, the Coalition, the SHPO and the ACHP to develop a MOA similar to the one developed for the Fourmile Hill Geothermal Development Project. However, the Tribes were not in agreement to develop a MOA for this Project. Nevertheless, both the BLM and the FS have determined that many of the principles of the Fourmile Hill MOA that minimize the effects of geothermal development on historic properties within the Medicine Lake Highlands are also pertinent to this Project. Therefore, those principles were considered in developing the Permit Conditions of Approval and Agency Commitments (see Section VII. Additional Mitigation Measures).

## III. REASONS FOR THE DECISION

In April 2002, the Department of Justice entered into a settlement agreement, whereby the BLM and the FS agreed to reassess the information and factors associated with the original decision. We have reviewed the entire record, completed further environmental analysis and conducted further consultation with the Tribes and considered other factors (see Section III. B) prior to making our decision.

### A. Reason for Reversal of the Original Decision

**1. Approval of the Plan of Operation Is Consistent with the Modoc National Forest Land and Resource Management Plan (LRMP).** The original decision denying the project was based partly on a finding that approval of the project would not be consistent with the LRMP that is the forest-wide standard and guideline to "protect" and "conserve" cultural resources, that standard in effect precluded geothermal development. In fact, the National Forest Management Act, and the LRMP state that forest plans do not modify existing contracts, such as the pre-existing geothermal lease. Additionally, the forest-wide standards and guidelines must be read in conjunction with all other forest-wide management direction; other standards and guidelines; and specific management area direction. For the Medicine Lake Management Area, the LRMP direction is that "other management activity should not preclude geothermal development." The forest-wide standard and guideline, to "protect" and "conserve" cultural resources, was not meant to exclude all forest uses and was intended to be applied to tangible physical artifacts and sites that may exist within the footprint of a project. The nomination of the Cultural District postdates the LRMP and the FS has not committed to the exclusion of all other forest uses within the District. Therefore, other management projects may be permitted within the District.

The original ROD denying the project was also based, in part, on the finding that issuance of a special use permit in a Managed Late Successional Area (MLSA) was not consistent with the LRMP, as amended by the Northern Spotted Owl Amendment. This is a misinterpretation of the Northern Spotted Owl Amendment. The Northern Spotted Owl Amendment does not preclude issuance of special use permits in areas of MLSA.

**2. Approval of the Plan of Operations Is Consistent with the FS Policy on Permitting of Special Uses.** The original ROD denying the project was based, in part, on the finding that issuance of a special use permit was not consistent with FS policy. This was based on a mis-reading of the special use regulation, which states that the FS must reject proposals that would not be consistent or compatible with the purpose for which the lands are managed. As explained above, the management direction in the LRMP, in general, allows geothermal development and, specifically, the Medicine Lake Management Area is dedicated to geothermal development. Therefore, the proposed permit is consistent with the purposes for which the lands are managed. The original denial was also based on an interpretation that a transmission line through a roadless area was contrary to the FS Interim Road Prohibition Rule, which has since expired. (It should be noted that Alternative Route 2 does not cross a roadless area.)

**3. Approval of the Plan of Operation Is Consistent with the Lease Terms and Conditions.** The original ROD denying the project was based, in part, on the finding that approval of the project was not consistent with the lease terms and conditions. Part of the rationale was that because the issuance of a FS special use permit was not consistent with FS regulation and policy, the lessee could not meet all applicable laws and regulations. As discussed above, this finding was based on an incorrect interpretation of FS policy.

Secondly, the finding that approval of the project is not consistent with the terms and conditions of the lease is based on a mis-reading of Section 18 of the standard geothermal lease form. Section 18 of the geothermal lease form states "The Lessee shall immediately bring to the attention of the Authorized Officer any antiquities or other objects of historic or scientific interest, including but not limited to historic or prehistoric ruins, fossils or artifacts discovered as a result of operations under this lease, and shall leave such discoveries intact. Failure to comply with any terms and condition of preservation of antiquities may constitute a violation of the Antiquities Act (16 U.S.C. 431-433)."

The intent of this section is clearly to protect tangible physical artifacts that may exist within the footprint of a project. As in this case, both the Proposed Action and the Project have been surveyed, or will be surveyed prior to any ground disturbing activity, to determine the presence of such artifacts. The FEIS/FEIR thoroughly addressed this issue and on page 3.5-8, section 3.5.3.3.1, states "The Proposed Action would not affect any recorded cultural resources or paleontological resources within the study area." Since the FEIS/FEIR concludes that physical cultural resources will not be impacted within the study area and the study area includes the Project; the Project is, therefore, consistent with lease terms and conditions.

**4. The Production of Renewable Geothermal Energy Is in the Public Interest and Is in Concert with Managing for Other Forest Uses and Values.** The original ROD denying the project found the current and expected traditional uses and values associated with the setting of the Medicine Lake Caldera area exceeded those values obtained by developing the geothermal power at Telephone Flat. While the traditional values and uses associated with the setting of the Medicine Lake Caldera area have remained the same since the denial of the Proposed Action in

May 2000, the demand for electrical energy surrounding this area has continued to change. In particular, there was an increased focus on developing geothermal resources as a result of our country's energy policy and California's requirement to increase renewable energy supplies at least by 20 percent by 2017. This Project will provide sufficient electrical energy to supply the needs of approximately 50,000 homes. The need for electrical energy in the West, and particularly California, has significantly changed since May 2000.

While the BLM and the FS acknowledge the impacts from the Telephone Flat Project on traditional values and uses, many of the impacts can be mitigated by implementing the measures outlined in this ROD. The most obvious impacts such as visual, noise and general increased activity within the area are temporary in nature. After the drilling and construction phase, the intermittent activity that would take place over a 3-year period, the impacts from visual, noise and the overall general activity will be reduced to a large extent. The Project has a project life of approximately 45 years, after which the wells would be plugged and abandoned, the pipelines, power plant, ancillary facilities, and transmission line dismantled and removed, and the disturbed areas reclaimed and re-vegetated. Once reclaimed, it is anticipated that the Project's physical impact to surface resources will be negligible. Most of the identified features important to American Indian traditional use will not be physically impacted by this operation, but there will be a presence of energy development within the Medicine Lake Caldera that is not there today. The Medicine Lake Caldera is the remnant of a collapsed volcano about 6 miles long and 4 miles wide and about 2,500 feet above the surrounding Medicine Lake Highlands, a volcanic terrain several hundred square miles in area. The total acreage disturbed is a fraction of 1 percent of the Medicine Lake Highlands, and the general project area encompassing well sites, power plant and the transmission line is less than 3 percent of the Medicine Lake Highlands.

Although the FEIS/FEIR identifies the proposed power plant location and Alternative Transmission Line Route 1 as the agency's preferred alternative, consultation with the Tribes, as a result of the reconsideration process, revealed that the viewshed from Red Shale Butte on the east side of the Medicine Lake looking westward towards Medicine Lake and Mt. Shasta, was very important to their spiritual use of the area. Recent visits to Red Shale Butte by the Tribes and the ACHP have confirmed that if constructed the power plant and Alternative Transmission Line Route 1 (segments D-1 and A-2) would be seen from Red Shale Butte. Mitigation of the visual effect of the transmission line (Route 1) has been determined to be more difficult than mitigating the visual effects of the power plant, and the selection of Route 2 will eliminate this impact to the viewshed looking westward from Red Shale Butte. Route 2 would also avoid the impacts that Route 1would have on the Mt. Hoffman Released Roadless Area (MHRRA) and visual impacts in the area of the Glass Mountain glass flow.

To accommodate the concerns expressed by Tribes, the ACHP, and members of the public, the BLM and the FS are selecting Alternative Transmission Line Route 2, which will reduce, but not eliminate, the visual impact of the Project on the Red Shale Butte viewshed. The viewshed of Red Shale Butte was not considered as a Key Observation Point (KOP) in the FEIS/FEIR process since the area is closed to vehicle traffic and can only be accessed by foot, or by vehicle during official

tours by the FS. In the case of the MHRRA and the Glass Mountain glass flow however, Alternative Transmission Line Route 2 will not cross these two areas and so it will eliminate the impacts of the 230-kV transmission line on spiritual use. Impacts associated with Alternative Transmission Line Route 2 were thoroughly analyzed in the FEIS/FEIR. While this route will impact the MLSA on the south and southeast side of Red Shale Butte and Lyons Peak, these impacts can be mitigated by adopting the management recommendations of the Amended Biological Assessment, whereas the visual impacts of Alternative Transmission Line Route 1 within the viewshed of Red Shale Butte could not be mitigated. The power plant will remain in the same location, alternative site A, as addressed in the FEIS/FEIR.

To reduce the impacts on traditional values and uses, the BLM and the FS have agreed to approve the proposed power plant site coupled with Alternative Transmission Line Route 2, instead of Alternative Transmission Line Route 1. This alternative, the same as "the Project," will reduce the impact of the transmission line on the viewshed looking westward from Red Shale Butte, and eliminate the impacts on the MHRRA and the Glass Mountain glass flow. These impacts were identified in the FEIS/FEIR. There has been considerable deliberation on this particular aspect of the Project in order to balance the public's interest in renewable energy and weigh the needs of the Tribes and other affected groups. For the reasons discussed above, we conclude that the social and environmental benefits achieved from the Project's production of renewable electrical energy are a reasonable trade-off to the temporary impacts associated with the Project.

**B. Other Factors**

**1. Renewable Energy Needs.** There has been an increased emphasis on exploring and producing geothermal energy to help supply our energy needs. Geothermal energy is a good source of clean, reliable energy which can help to diversify the Nation's domestic energy portfolio and provides an excellent opportunity to reduce our dependency on fossil fuels.

In the late 1990s, market conditions provided a limited opportunity to sell geothermal power. In 2001, the Department of Energy's Energy Information Administration predicted that over the next 20 years, if conditions remain constant, US energy consumption will increasingly outpace US energy production. Renewable energy resources can play an important part in an overall energy plan to ensure energy stability.

In May 2001, a National Energy Policy was adopted which directed federal agencies to develop strategies to plan for the country's future energy needs by developing our energy resources in a sound environmental manner. This long-term comprehensive strategy focuses on increasing conservation, modernizing and expanding energy infrastructures, ensuring environmental protection, and strengthening our national energy security. Renewable energy development was specifically highlighted as an important integral part of the policy. It was recommended that agencies look at opportunities to enhance production of renewable energy resources such as geothermal energy on federal lands. As directed by this policy, the Secretaries of the Interior and Energy are also working with Congress to legislate the use of lease revenues to fund research into renewable energy resources, including geothermal energy resources. The National Energy Policy

or its direction was not in place at the time the FEIS/FEIR for the Telephone Flat Geothermal Development Project was issued in February 1999.

Recently, Governor Grey Davis signed into law a Renewable Energy Portfolio that will require the three major utilities in California to have at least 20 percent of their energy sources derived from renewable energy resources, including geothermal, by 2017. With current renewable energy sources supplying between 8-10 percent of California's energy needs, the demand for such resources will continue to increase. This increase in demand, coupled with an increasing public awareness of the potential for carbon dioxide to affect our atmosphere, continues to place demand on the use of geothermal energy sources in California, the West, and throughout the world.

**2. Alternative Transmission Line Route 2 Avoids Cultural District and Minimizes Impact to Medicine Lake Area.** To avoid impacting the Medicine Lake Area Traditional Cultural Places District and the Medicine Lake Area, Transmission Line Route 2 is being selected. Although longer and more expensive for the project proponent, Route 2 leaves the area directly to the east and thus avoids the Cultural District and the Medicine Lake area.

Alternative Transmission Line Route 2 does impact approximately 130 acres of suitable habitat for Northern Spotted Owl roosting/foraging habitat within the MLSA on the south and southeast slope of Lyons Peak to the east of the Medicine Lake Caldera. There are 23,615 acres of suitable roosting/foraging habitat on the Modoc National Forest. The Northern Spotted Owl Plan Amendment requires that the impacts to the MLSA be neutral or beneficial for the Northern Spotted Owl. For the acres of MLSA affected by the proposed transmission line, offset replacement acreage has been identified within the planning area that will be managed as late successional reserve. Therefore, this route is consistent with current FS policy regarding the approval of activities within MLSA. By adopting the management recommendations of the Amended Biological Assessment, the selection of Alternate Transmission Line Route 2 is consistent with the Modoc National Forest LRMP, as amended by the Northern Spotted Owl Plan Amendment. In addition, Calpine and any successor-in-interest must comply with any terms and conditions and any other requirements resulting from Section 7 Consultation of the Endangered Species Act.

**3. NEPA Sufficiency.** In November 2002, a report (*Update Assessment for the Telephone Flat Geothermal Development Project Final Environmental Impact Statement/Environmental Impact Report*) was prepared documenting a review of the FEIS/FEIR. This report concludes no significant new circumstance or information relevant to environmental concerns and bearing on the Proposed Action (proposed power plant site and Alternative Transmission Line Route 1) has occurred since the FEIS/FEIR was released in February 1999. The analysis of the current conditions determined that Alternative Transmission Line Route 2, as analyzed in the FEIS/FEIR, is technically and financially feasible, and the impacts of this transmission route on American Indian cultural values are less than the impacts of Alternative Transmission Line Route 1. The "Update Assessment" also identified no new significant environmental impacts potentially resulting from the Proposed Action, or the Project (proposed power plant site and Alternative Transmission Line

Route 2), no new mitigation measures proposed to be implemented, nor did it find a substantial increase in the severity of any environmental impact that would now result from the Project.

4. **Tribal Consultation.** The BLM and the FS acknowledge the importance of the Medicine Lake Highlands, particularly within the caldera, to tribal governments, communities and individual traditional practitioners. Both the BLM Director and the FS Chief met with the Chairman of the Klamath Tribes and the Chairman of the Pit River Tribe. The agencies also took into consideration the opinions of the SHPO and the ACHP, both of whom opposed the Project. However, both the BLM and the FS believe that the utilization of renewable energy resources, such as geothermal, is in the public interest for the United States, and can be used while not eliminating American Indian traditional values and uses of the area. Based upon the recent discussion by the BLM Director and the FS Chief with the Klamath Tribes and the Pit River Tribe, the agencies decided to use Alternative Transmission Line Route 2 to reduce the impacts of this transmission route on American Indian traditional values and uses.

5. **Leasehold Interests.** In addition to the key rationale identified in the above items 1-4, the BLM and the FS decision is based upon the combination of several other factors, including the lease right previously granted to the Federal leaseholder to explore for, and utilize the geothermal resource located within the boundaries of the lease, and the leaseholder's compliance with all terms and conditions set forth in those leases.

Part of the rationale to deny the Proposed Action in the original ROD dated May 2000 was based upon the determination made by the BLM that the leaseholder had not complied with applicable laws and regulations to obtain necessary permits, including the FS Special Use regulations, and the Interim Road Prohibition Rule (this rule has since expired). At that time it was determined that issuance of a special use permit was not consistent with FS policy. That determination was based on an incorrect interpretation of the special use regulations, and therefore Calpine and any successor-in-interest should be able to acquire the necessary FS permits for the Project.

**C. Record of Decision**

This ROD is a joint BLM and FS document. However, each agency is making decisions that pertain to separate activities identified in the Plan of Operation for the Project.

1. **Bureau of Land Management.** For the BLM, the decision pertains to all activities within the lease boundaries which include:

   a. construction, operation, and maintenance of the well fields, including both production and injection wells;

   b. construction, operation and maintenance of the pipelines; and

   c. construction, operation and maintenance of the power plant.

These activities will be authorized by the issuance of a Geothermal Drilling Permit and Sundry Notice, a Facility Construction Permit, a Commercial Use Permit, and a Geothermal Site License.

2. **Forest Service.** With regard to the FS's decision, it include:

a. permitting construction, operation and maintenance of a 230-kV overhead transmission line;

b. issuance of a road use permit for access to the power plant;

c. permitting temporary water well use and water line placement and maintenance; and

d. issuance of a Forest Order that prohibits firearm discharge within the vicinity of the Telephone Flat power plant.

## IV. GOVERNMENT CONSULTATION AND PUBLIC INVOLVEMENT

On April 4, 2002, Calpine and the United States entered into a Settlement Agreement in the U.S. Court of Federal Claims providing the BLM and the FS the opportunity to reconsider the May 31, 2000 denial of the Telephone Flat Proposed Action. As part of the process of the reconsideration, it was necessary to re-initiate consultation under Section 106 of the National Historic Preservation Act, with the Tribes and others to discuss the Proposed Action and explore the possibilities of mitigation measures which could reduce, or possibly eliminate, impacts of the Proposed Action, if approved, on the American Indian traditional values and uses in the Medicine Lake Highlands. In addition, the public was asked to participate and comment at several points during the reconsideration process. A list of the various tribal, agency, and public contacts that were made as part of this reconsideration process is contained in the Table below:

| Date | Contacts | Type of Contact |
|---|---|---|
| April 5, 2002 | Pit River, Klamath Tribes, Shasta Nation, Shasta Consolidated, Native Coalition, SHPO, ACHP | Telephone calls made by BLM to advise of the Settlement Agreement/Reconsideration of Telephone Flat Project. Sent fax of Settlement Agreement |
| April 11, 2002 | Pit River, Klamath Tribes, Shasta Nation, Shasta Consolidated, SHPO, ACHP | BLM sends letter addressing reconsideration process and requests comments/meeting within 30 days |
| May 29, 2002 | Pit River, Klamath Tribes, Shasta Nation | Telephone call made to follow-up on letter of April 11, 2002 |

| Date | Contacts | Type of Contact |
|---|---|---|
| May 31, 2002 | BLM-Alturas Field Office | Letter sent to interested parties requesting comments on changes which have occurred since FEIS/FEIS was released in February 1999 – 30 day review period. |
| July 13, 2002 | Shasta Nation | Consultation meeting with BLM and FS in Macdoel, CA |
| July 15, 2002 | Klamath Tribes, Pit River Tribe, ACHP | BLM/FS leads tour of Telephone Flat area |
| July 16, 2002 | Pit River Tribe | Consultation meeting with BLM and FS in Burney, CA |
| August 8, 2002 | Klamath Tribes | Consultation meeting with BLM and FS in Chiloquin, OR |
| August 16, 2002 | BLM | BLM send letter to ACHP advising of determination to terminate consultation on Telephone Flat Reconsideration Project effort. |
| August 22, 2002 | Pit River, Klamath Tribes | FS leads tour of Medicine Lake Highlands for input on HPMP |
| September 16, 2002 | ACHP, Pit River, Klamath, SHPO | BLM leads tour for ACHP of Telephone Flat and Fourmile Hill areas. |
| September 16, 2002 | Public Meeting | ACHP Public Meeting on the reconsideration of Telephone Flat Project at Mt. Shasta, CA |
| September 27, 2002 | ACHP | ACHP responds to Secretaries of Agriculture and the Interior on the findings and recommendations for the Telephone Flat Reconsideration Project. |
| October 15, 2002 | BLM-Director, FS Chief, Klamath Tribes, and Pit River Tribes | Consultation meeting on Telephone Flat in Denver, CO |

Both the BLM and the FS realize the importance of American Indian traditional values and uses in the Medicine Lake Highlands, and made significant efforts to engage the Tribes and to fully understand their concerns. Due to this importance, the BLM Director and the FS Chief met

directly with the Chairman of the Klamath Tribes and the Chairman of the Pit River Tribe, to listen to their concerns and issues associated with the Telephone Flat Proposed Action. In addition, the September 27, 2002 letter from the ACHP responding to BLM's decision to terminate consultation and findings/recommendations from the ACHP's public tour and hearing on the reconsideration process were carefully considered. As a result, and after consideration of competing demands, the agencies determined that the Project (proposed power plant site, coupled with Alternative Transmission Line Route 2) would further reduce, but not eliminate, some of the impacts to American Indian traditional values and uses.

In terms of public outreach, BLM sent a letter on May 31, 2002, to approximately 125 individuals and groups, addressing the April 4, 2002, Settlement Agreement allowing the BLM and the FS the opportunity to reconsider the denial of the Telephone Flat Proposed Action. The letter specifically requested comments addressing any changes that may have occurred since the 1999 FEIS/FEIR was released in February 1999. During the 30-day public comment period identified in the letter (May 31 to June 30, 2002), a total of 24 letters, postcards, and e-mails were received by BLM. Of the 24 documents or e-mails received, 19 stated that they supported the May 2000 denial of the Telephone Flat Geothermal Development Project and that nothing had changed since the date of that decision. One letter addressed concerns over impacts to recreation, groundwater, cultural resources, noise, visual quality, and the cumulative impacts associated with the development of up to 600 megawatts of geothermal powered electricity in the Medicine Lake area. Two letters also addressed concern over the financial stability of Calpine due to the decreasing value of the company's stock and bond rating. The remaining two letters voiced support for the Project and yet agreed with the 19 letters stating that nothing had changed since the release of the 1999 FEIS/FEIR or the May 31, 2000, decision denying the Telephone Flat Proposed Action.

## V. ALTERNATIVES CONSIDERED

In response to public issues, the FEIS/FEIR documents the effects of three alternative power plant locations and two transmission line routes from each power plant location. Figures 2.2.10, 2.3.1 and 2.3.3 in the FEIS/FEIR display the general location of the power plant and associated well field/reinjection fields. In regards to transmission line alternatives, there are two major routes analyzed. These are displayed in Figure 2.4.1 of the FEIS/FEIR with the study area for each alternative being a 1000-foot wide corridor. The alternatives respond to avoiding the visual and noise impacts to the Medicine Lake area and entry into the MHRRA.

### A. Proposed Action, as Amended (Selected Alternative and Power Plant)

The Telephone Flat Proposed Action is located in Siskiyou County on federal lands that are managed by the Modoc National Forest. The subject federal geothermal leases are within the Glass Mountain KGRA, which is managed by the Alturas Field Office of the BLM. The Proposed Action is to construct and operate a 48-megawatt geothermal power plant located approximately 2 miles east of Medicine Lake and within the Medicine Lake Caldera. Associated construction would involve 18 well pads, pipelines, an overhead transmission line and access roads. The Proposed Action is defined in three phases: construction, operation and decommissioning. The

construction phase will occur over a 3-year period. The power plant is anticipated to operate for 45 years and would generate up to 48 megawatts of electricity hourly. At the end of the 45-year operation phase, the decommissioning phase would commence.

**B. Transmission Line**

Calpine proposes to construct and operate a 230-kV overhead transmission line that would extend from the Telephone Flat geothermal power plant and connect to the agency selected transmission line route for the approved Fourmile Hill Geothermal Project. The FEIS/FEIR incorporated by reference the analysis of that portion of the Fourmile Hill transmission line route that would be identical for this Project. The transmission line would be a wood pole H-frame construction and extend for approximately 12 miles on National Forest System lands, if approved via Alternative Transmission Line Route 2 segments D-2 and B-2. The line would extend in an easterly direction from the power plant location and run south of Red Shale Butte and Lyons Peak before heading in a northeasterly direction for several miles, and then easterly for several more miles until the line reaches the COTP 500-kV transmission line corridor. Once in the corridor, the line parallels the 500-kV line in a northeasterly direction until it intersects the 230-kV line coming from the Fourmile Hill geothermal project. The Telephone Flat transmission line would then connect with the approved Fourmile Hill route and continue in a generally eastward direction until it connects to the BPA Malin-Warner 230-kV line.

Calpine also proposes to place an above ground temporary water line from the existing ground water well in the Arnica Sink area to the Project site. The Proposed Action, as modified by the inclusion of the Alternative Transmission Line Route 2 instead of Route 1, includes the need for year-round access to the Project site for construction and operation of the geothermal facilities.

**C. Alternative Power Plant Locations**

Two power plant alternatives are analyzed in the FEIS/FEIR. One site (Alternative Power Plant Site A) is located approximately ¼ mile east of the Proposed Action (proposed power plant site) and the other site (Power plant Alternative B) is located ½ mile east of the Proposed Action site. These alternatives were not selected since the movement of the power plant away from the productive center of the geothermal reservoir anticipated to be near well #87-13 increases the requirement for additional production wells, and therefore, additional surface disturbance in order to compensate for the energy loss caused by the greater distance between the production well field and the power plant.

**D. Alternative Transmission Line**

The Alternative Transmission Line Route 1 would extend in a northerly direction from the power plant location and go east of Mt. Hoffman and bisect the MHRRA. It would then connect with the approved Fourmile Hill 230-kV transmission route and continue in a generally eastward direction until it connects to the BPA Malin-Warner 230 kV line. This route was not selected since it would impact the viewshed of Red Shale Butte looking westward towards Mt. Shasta, create greater impacts to American Indian traditional values and uses, and physically impact both the MHRRA and the Glass Mountain flow.

**E. No Action Alternative**

The No Action Alternative would not approve the Project. The No Action Alternative is the environmentally preferred alternative because it would create no additional environmental impacts. The No Action alternative would also preclude the ability for the potential geothermal energy within this area to help address our country's current energy needs and contribute to a clean, diverse portfolio of energy sources.

**VI. ALTERNATIVES NOT CONSIDERED IN DETAIL**

**A. Alternatives that were Considered but Eliminated from Detailed Study**

1. Additional Alternative Power Plant Locations
2. Additional Alternative Transmission Line Routes
3. Buried Electrical Transmission Line

**B. Rationale for Dismissing the Alternatives**

**1. Additional Alternative Power Plant Locations.** Concern was expressed about the proximity of the power plant to the seasonally occupied residential and developed recreational facilities near Medicine Lake. Two alternative power plant sites are analyzed in the FEIS/FEIR. Additional plant locations that were located further from Medicine Lake were determined to be uneconomical, not technically feasible and equivalent to the No Action Alternative. Unlike oil and gas development, geothermal power development must be done near the well location. As the geothermal resource is transported via pipeline away from the wellhead, the efficiency of the operation decreases and the need for additional wells increases, thereby resulting in additional environmental impacts.

**2. Additional Alternative Transmission Line Routes.** The primary objective of the transmission line is to connect the power generation capability of the proposed power plant to the BPA transmission line system. The nearest BPA connection is located east of the project area at the Malin-Warner 230-kV transmission line. The routes that are analyzed in detail in

the FEIS/FEIR are those that minimize the length of construction and reduce the impacts associated with construction, operation and maintenance of the line. Routes in a westward, southerly or northerly direction from the power plant were not considered in detail because the routes would require significantly more surface disturbance, would impact more environmentally sensitive areas, and would be more costly and not reduce the overall impacts associated with the transmission line.

3. **Buried Electrical Transmission Line.** Although technically feasible, buried transmission lines are extremely costly. The cost can be as much as 8 to 12 times that of an overhead transmission line. The significantly higher cost for construction was the primary reason for not analyzing this alternative. Calpine has stated that the requirement to bury the transmission line would financially burden the Project to such a degree that the Project would be uneconomical and Calpine would not pursue development of the Project.

## VII. ENVIRONMENTALLY SUPERIOR ALTERNATIVE (CALIFORNIA'S ENVIRONMENTAL QUALITY ACT)

California's Environmental Quality Act (CEQA) states that if the "No Project Alternative" (No Action Alternative) is the "Environmentally Superior Alternative," then the Environmental Impact Report must also identify from the other Alternatives an Environmentally Superior Alternative (CEQA Guidelines Section 15126(d)(4)). Similarly, NEPA regulations require that when preparing an Environmental Impact Statement in the ROD must identify an Environmentally Preferable Alternative.

Based on the analysis provided in the FEIS/FEIR, the No Action Alternative could be considered the Environmentally Superior Alternative (under NEPA this is the environmentally preferred alternative) because it would create no additional environmental impacts. However, it would also preclude the ability for the potential geothermal energy within this area to help address our country's current energy needs and partially California's demand for additional renewable energy. To comply with CEQA requirements, a new Environmentally Superior Alternative would need to be selected from among the other alternatives.

As identified in the 1999 FEIS/FEIR, the alternative that would cause the least damage to the biological and physical environment, and that would best protect, conserve and preserve, historic, cultural and other natural resources, while meeting both the objectives of, and the purpose and need for the Project, would be the Proposed Action, as modified (proposed power plant site and Alternative Transmission Line Route 2). Based upon the analysis contained in the FEIS/FEIR, and the additional factors considered during the reconsideration process, it was determined that the proposed Project with Alternative Transmission Line Route 2 is more environmentally preferable and would best serve the public's interest and result in the fewest environmental impacts. Therefore, in compliance with both CEQA and NEPA, the Project, as modified (Alternative Transmission Line Route 2) is now considered the Environmentally Superior Alternative, as well as the Environmentally Preferred Alternative.

## VIII. ADDITIONAL MITIGATION MEASURES

### A. Permit Conditions of Approval

The COA will be enforced by requiring appropriate adjustments to each permit proposal, prior to agency approval.

1. To the maximum extent practicable, noise will be controlled through the use of mufflers, baffles, and other noise-deadening devices, through careful control of pipe and machinery handling, and other means developed in consultation with Calpine, the Tribes, and the Coalition, to minimize noise at locations where natural quiet is important to cultural use of the area by the Tribes.

2. Calpine or any successor-in-interest shall obtain the services of a professional landscape architect to minimize visual impact of the area including the power site. In consultation with a professional landscape architect, to the maximum extent practicable, visual impacts will be reduced through the use of light shrouds, non-specular and appropriately colored facilities and construction materials, cooling tower design to facilitate steam-plume dissipation, and other means developed in consultation with Calpine, the Tribes, and the Coalition.

3. Calpine shall provide the Tribes free and unrestricted access to the Project area, to the extent permitted by safety considerations, resource protection needs, project and public land security needs, and other limitations, consistent with applicable laws and regulations, before, during, and after the life of the Project. Any specific limitations restricting tribal access must be submitted by Calpine to the BLM and the FS for approval.

4. Calpine shall comply with the specific mitigation measures listed under the "PROPOSED ACTION" column in Table ES.6 of the FEIS/FEIR prepared for the Telephone Flat Geothermal Development Project.

5. Calpine shall comply with the specific mitigation measures listed under the "TELEPHONE FLAT PROJECT ROUTE (LINE SEGMENTS D2 + B2)" column in Table ES.7 of the FEIS/FEIR prepared for the Telephone Flat Geothermal Development Project.

6. Calpine shall comply with the specific mitigation measures listed under the "Summary List of the Identified Significant Cumulative Environmental Impacts of the Telephone Flat and Fourmile Hill Geothermal Development Projects" column in Table ES.8 of the FEIS/FEIR prepared for the Telephone Flat Geothermal Development Project.

**B. Agency Commitments**

As approving agencies, the BLM and the FS shall ensure that the possible impacts from the Project on historic properties and other resources are minimized through enforcement of laws, regulations, lease terms, and permit COA, as summarized in the following:

1. **Auditory Effects.** In consultation with the Tribes, the Coalition, and Calpine, the BLM and the FS shall document locations where natural quiet is important to traditional use of the area by the Tribes. The BLM and the FS will ensure that noise associated with the approved Project activities is monitored at these locations prior to and during Project activities. Noise will be minimized at these locations to the maximum practical extent through the use of best available technology.

2. **Visual Effects.** In consultation with the Tribes, the Coalition, and Calpine, the BLM and the FS shall identify site-specific locations where the sight of Project activities (e.g., drilling and flow testing), power plant construction and operation (e.g., night lighting and steam plumes), ancillary facilities construction and operation (e.g., pipelines and transmission lines) may impact the cultural use of the area by the Tribes. The BLM and the FS will ensure that Project activities, and structures are not visible from such sites, or, if lack of visibility cannot be achieved, that visibility is minimized during the operation of the activity or activities through the use of the best available technology.

3. **Access Limitations.** In accordance with Executive Order No. 13007, the BLM and the FS shall ensure that the Tribes are afforded free and unrestricted access to public lands in the Highlands, including the Project area, to the extent permitted by safety considerations, resource protection needs, project and public land security needs, and other limitations, consistent with applicable laws and regulations, before, during, and after the life of the Project.

4. **Archaeological Site Effects.** In consultation with the SHPO, the Tribes, the Coalition, and Calpine, the BLM and the FS shall, prior to initiation of any ground-disturbing activities, complete any remaining survey work, to ensure that any archaeological sites subject to direct effects (e.g., well drilling or construction) and potentially indirect effects (e.g., artifact collecting or vandalism) resulting from the Project are identified, and that the sites receive the proper protection or mitigation, as provided under the laws. Protection is the preferred objective and may be achieved through such means as Project design, relocation of Project facilities, and site burial. Mitigation may include data recovery in a manner consistent with contemporary archaeological practices, balanced with the interests of the Tribes. Should there be disagreement among the Tribes as to whether and/or how to conduct data recovery, or otherwise avoid or minimize effects to a site, the BLM and the FS will afford the Tribes a reasonable opportunity to resolve the disagreement, and, in consultation with the SHPO, implement a decision which incorporates the collective recommendations of the Tribes. When data recovery is the selected mitigation, the BLM and the FS will approve the design and implementation of the data recovery, to the maximum extent practicable in a manner

consistent with the Council's *Recommended Approach for Consultation on Recovery of Significant Information from Archaeological Sites* (64 FR 27085-27087, May 18, 1999). Recovered material and data shall be managed in accordance with 36 CFR 79, except for any American Indian cultural items repatriated to Tribes pursuant to the Native American Graves Protection and Repatriation Act (NAGPRA). In consultation with the Tribes, the BLM and the FS will ensure that a Plan of Action is developed and implemented in accordance with 43 CFR Part 10 for the management of NAGPRA items.

5. **Air and Water Quality.** The BLM and the FS, together with the Siskiyou County Air Pollution Control District and the California Regional Water Quality Control Board, shall ensure that the quality of the air and water in the Medicine Lake Highlands is protected through the use of appropriate pollution control devices and measures.

6. **Plants and Wildlife.** The BLM and the FS shall approve operations in order to minimize impacts on native plants and wildlife, and re-vegetate disturbed lands to meet the management objectives of the Amended Biological Assessment, and of the Modoc National Forest Land and Resource Management Plan.

7. **Contingency Plans.** The BLM and the FS shall ensure that Calpine and any successor-in-interest develops and annually updates Contingency Plans to control unanticipated Project impacts on the natural and cultural environment resulting from such hazards as well pad sump and pipeline leakages, well blowouts, and fire.

8. **Decommissioning and Reclamation.** The BLM and the FS shall, after consultation with the Tribes and the Coalition, ensure that upon decommissioning of the Project, or upon abandonment of the Project after well testing, if such testing reveals no usable resource, all lands impacted by the Project 's operations are restored to meet the management objectives of the Amended Biological Assessment and the Modoc National Forest Land and Resource Management Plan.

9. **Project Monitoring.** The BLM and FS shall implement a monitoring program to ensure that Calpine and any successor-in-interest complies with applicable laws, requirements, lease terms, permit Conditions of Approval, and other mitigating measures, and will afford the Tribes, the Coalition, and SHPO the opportunity to participate in such monitoring. Included in this monitoring program shall be the establishment of a federal oversight group to review monitoring data and the compliance of Calpine and any successor-in-interest with various impact thresholds established in the FEIS/FEIR.

10. **Reclamation Bonding.** The BLM and FS shall require Calpine or any successor-in-interest to post financial assurance in an amount sufficient to cover all costs of site reclamation, including but not limited to well plugging and abandonment, power plant and transmission line removal, and site reclamation. The surety instrument shall be specific to the Project and shall be in addition to the BLM lease and site license bond requirements under 43 CFR 3214.13. The BLM will require that the surety instrument be posted subject to partial or

complete forfeiture if the conditions of approval and permit terms are not completed within time periods specified by the BLM, provided that the BLM may agree to an extension of any such time periods, in consultation with the Tribes and the FS. In the event forfeiture is imminent, BLM shall notify Calpine or its successor-in-interest that the surety instrument is subject to forfeiture, and shall allow Calpine or its successor 30 days to respond before taking action to execute forfeiture. The BLM shall release the surety instrument, in whole or in part, as specific provisions are completed to the satisfaction of the approving agency or agencies, in consultation with the Tribes.

11. **Phasing.** In consultation with the SHPO, the Tribes, the Coalition, and Calpine or any successor-in-interest, the BLM and the FS may implement these commitments in phases throughout the Project's development.

## IX. ADMINISTRATIVE REVIEW OR APPEAL OPPORTUNITIES

This decision is signed by the U.S. Department of the Interior, Assistant Secretary for Land and Minerals Management, and the U.S. Department of Agriculture, Chief of the Forest Service.

As such, this approval of the Telephone Flat Geothermal Development Project constitutes the final administrative action for the U.S. Department of the Interior.

Pursuant to the terms of the Settlement Agreement, the Department of Agriculture's portion of the decision (see Section II. C.) is subject to appeal in accordance with the regulations at 36 CFR 215. No part of the Department of the Interior's decision is appealable under 36 CFR 215. An appeal may be filed by those who have commented on or otherwise expressed interest in this specific project before the close of the comment period. To appeal this decision, a written appeal must be postmarked or received within 45 calendar days after the date of notice of this decision in The Modoc Country Record newspaper (Alturas, California). However, when the 45-day appeal filing period would end on a Saturday, Sunday or federal holiday, the filing time is extended to the end of the next federal working day. The appeal must be sent by mail to: USDA Natural Resources and Environment, ATTN: Mark Rey – Under Secretary, 1400 Independence Avenue, SW, Room 217E, Whitten Building, Washington, DC 20250-0108. Contents of an appeal must meet the requirements at 36 CFR 215.14.

If no appeal is filed, this decision may be implemented on, but not before 5 business days from the close of the appeal filing period. If an appeal is filed, this decision may not be implemented for 15 calendar days following the date of appeal disposition. In the event of multiple appeals on this decision, the date of the last appeal disposition controls the implementation date.

## X. SUMMARY STATEMENT /SIGNATURES /DATE

As the responsible official for authorizing the U.S. Department of the Interior's proposed actions, I have determined that permitting the power plant construction and development of the geothermal resources are in the public interest, and I hereby authorize Permits and Licenses to be issued, after completing any remaining on-the-ground, site-specific cultural surveys of proposed ground-disturbing actions, and applying the mitigation that is identified in this document.

Rebecca W. Watson
Assistant Secretary – Land and Minerals Management
Department of the Interior

11/26/02
Date

As the responsible official for authorizing the Department of Agriculture's proposed actions, I have determined that permitting a transmission line, road use permit and temporary use of a water well and water line is in the public interest, and I hereby authorize the appropriate permits to be issued after completing any remaining on-the-ground, site-specific cultural surveys of proposed ground-disturbing actions, and applying the mitigation that is identified in this document.

Dale N. Bosworth
Chief, Forest Service
Department of Agriculture

11/26/02
Date

# EXHIBIT A5

USDA

United States Department of Agriculture

Office of the Secretary
Washington, D.C. 20250

April 11, 2003

Deborah A. Sivas
EARTHJUSTICE
Owen House – 553 Salvatierra Walk
Stanford, California 94305-8620

Dear Ms. Sivas:

You have filed a notice of appeal on behalf of your clients; Pit River Tribe, Klamath Tribe, Native Coalition for Medicine Lake Highlands Defense and Mount Shasta Bioregional Ecology Center. The appeal was filed pursuant to 36 CFR 215, protesting the Chief of the Forest Service's Record of Decision (ROD) approving the Proposed Action as modified, of the Telephone Flat Geothermal Development Project Final Environmental Impact Statement (FEIS).

I have reviewed the administrative record, including the Appellants' written notice of appeal, the ROD, FEIS, and supporting documentation. I have weighed the recommendation from the Appeal Reviewing Officer and incorporated it into this decision. A copy of the Appeal Reviewing Officer's recommendation is attached. This letter constitutes my decision on the appeal and on the specific relief requested.

APPEAL DECISION SUMMARY

I affirm the Chief's decision to implement the Proposed Action as modified (proposed power plant site with the modification of selecting Alternative Transmission Line Route 2, segment D-2 and B-2 instead of Alternative Transmission Line Route 1). Implementation of the decision may proceed no sooner than April 16, 2003.

FOREST ACTION BEING APPEALED

In May 2000, the Bureau of Land Management (BLM) and the Forest Service (FS) signed a joint Record of Decision denying the Telephone Flat Geothermal Development Project. In October, the project proponent filed a lawsuit against the Bureau of Land Management and the Forest Service in the U.S. Court of Federal Claims for the denial of the project alleging breach of contract and takings claims. As part of a settlement agreement of this litigation, the Department of Justice agreed the two agencies would reconsider the decision by November 2002. On November 26, 2002 a new Record of Decision was issued by the Chief, USDA Forest Service and the Assistant Secretary,



EXHIBIT
A5

Lands and Minerals Management, U.S. Department of the Interior. The new decision was the culmination of that reconsideration process, replacing and superceding the previous Record of Decision. Notice of this decision was published in the Modoc County Record on December 19, 2002.

The 2002 Record of Decision is also a joint U.S. Department of Interior and the U.S. Department of Agriculture document. However, each agency is making decisions that pertain to separate activities identified in the Plan of Operation. The part of the decision made by the Chief of the Forest Service is described in the attached Appeal Reviewing Officer's recommendation letter. In summary, the portion approved by the Forest Service includes a transmission line, a road easement, temporary water well use and waterline placement and maintenance. In addition, a forest order is approved prohibiting discharge of firearms within the vicinity of the power plant. Only the Forest Service's portion of the decision is subject to appeal in accordance with the regulations at 36 CFR 215. Approval of the project constitutes the final administrative action for the BLM.

**APPEAL SUMMARY**

The Department of Agriculture has no record of receiving an administrative appeal timely filed by the Earthjustice Environmental Law Clinic at Stanford on behalf of the Appellants. The Appellants are unable to demonstrate compliance with 36 C.F.R. 215.13(c) by producing physical evidence showing their appeal bore a U.S. Postal Service postmark dated on or before February 3, 2003. As a matter of discretion, I have agreed to review the Appellant's administrative appeal using the procedures set forth at 36 CFR Part 215, with six exceptions set forth in our agreement dated March 20, 2003.

The appellants request a decision granting their appeal and seek reversal of the Forest Service's approval of the Telephone Flat Geothermal Project. An informal resolution meeting by telephone was conducted on April 1, 2003 between the Forest Service, appellants and interested parties. No issues were resolved.

Interested party comments on your appeal were submitted by Robert Maynard, Attorney for CPN, Telephone Flat, Inc. and Calpine Corporation by letter dated March 28, 2003. Mr. Maynard's letter requested a final decision denying your appeal in its entirety in accordance with 36 CFR 215.17. Mr. Maynard concludes the subject appeal is untimely and therefore should be dismissed. Additionally, he concludes the allegations presented by the appellants have already been considered and rejected and that further delay of the project constitutes a breach and/or taking of CPN lease rights.

Another appeal of the Chief's 2002 decision was received from Stephan A. Volker on behalf of Save Medicine Lake Coalition, Medicine Lake Citizens for Quality Environment, Fall River Wild Trout Foundation, Klamath Forest Alliance, California Wilderness Coalition and Sierra Club. My decision on that appeal, which was timely, was signed and mailed to Mr. Volker on March 20, 2003.

**ISSUES AND RESPONSES**

**ISSUE A. The new ROD violates the Administrative Procedure Act.**

**RESPONSE:** The new ROD sets forth an adequate legal basis, consistent with the Administrative Procedure Act, for the decision to approve the Proposed Action as modified. The new decision acknowledges that traditional, cultural values associated with the Medicine Lake Highlands have remained the same since the original ROD denied this project. However, the demand for electrical energy in the surrounding area has continued to accelerate with an increasing focus on California's requirement for renewable energy resources. Reconsideration of the 1999 decision on the Telephone Flat project included weighing the increasing demand for renewable energy with the need to protect tradition cultural values. These considerations and the issue of what is in the public interest are clearly and logically articulated in the 2002 ROD (section III Reasons for the Decision, A.4).

Alternative Transmission Line Route 2 was selected during the reconsideration in order to reduce certain cultural impacts. Route 2 will avoid impacts that Route 1 would have on the Mt. Hoffman Released Roadless Area and visual impacts in the area of the Glass Mountain glass flow (ROD, III.A.4). Impacts associated with Route 2 in the Managed Late Successional Area (MLSA) can be mitigated by adopting the management recommendations of the Amended Biological Assessment.

Direction in the Modoc National Forest Land and Resource Management Plan (LRMP) for the Medicine Lake Management Area does not preclude geothermal development. Project approval requirements for survey, avoidance and/or mitigation of cultural sites adequately address the Forest plan standard. Approval of the plan of operation is consistent with the LRMP (ROD, III.A.1).

**ISSUE B. The leases on which the Telephone Flat Project will be operated are invalid.**

**RESPONSE:** The BLM is the agency responsible for issuing geothermal leases on Federal land. The BLM also is responsible for ensuring that activities proposed on federal geothermal leases are consistent with the specific lease stipulations as provided for in the Geothermal Steam Act. When the land involves surface resources managed by the Forest Service, the BLM must obtain consent from that forest prior to the issuance of a lease.

The appellants are challenging BLM's decision from the 1980's to issue geothermal leases. In 1981 the FS issued an environmental assessment entitled, "Environmental Assessment for Geothermal Leasing". This document was prepared to address the potential issuance of geothermal leases in and around the Glass Mountain Known Geothermal Resource Area (KGRA) and provide a basis for Forest Service decisions on consenting to lease issuance and stipulations.

The appellants and other members of the public had notice of the intent to issue leases when the 1981 Environmental Assessment was completed and the decision notice signed. Notice was sent to members of the public who had expressed previous interest and the decision was published in several newspapers of the area. Any objections to consent to the issuance of the subject leases should have been directed to the FS within the time provided by the then applicable FS administrative appeal procedures. Objections to the issuance of the leases themselves should have subsequently been directed to the BLM, the agency who is ultimately responsible for geothermal lease issuance. However, no such appeal or objection was filed with the Forest Service or the BLM. The time for objecting to the issuance of the subject leases has passed.

In a related appeal of the Fourmile Hill geothermal project, Save Medicine Lake Coalition challenged BLM's decision to issue the underlying leases. In this matter the Interior Board of Land Appeals found the appellants had notice of lease issuance and that the time for objecting was passed (156 IBLA 219, 227-228 [2002]). This decision also addresses the question of the propriety of BLM's subsequent extension of the leases and found the matter was also not timely raised. Additionally, once BLM determines the lessee has satisfied specific prerequisites for the extension of a geothermal lease, BLM's authority to approve such an extension is not discretionary.

The Forest Service and Department of Agriculture cannot provide relief for BLM actions such as those at issue here (i.e. BLM compliance with NEPA, NHPA or their fiduciary trust obligations in executing and renewing leases). Appeal of the Chief's decision on the Telephone Flat Project is not an appropriate forum for addressing these issues pertaining to BLM's authority and responsibility.

**ISSUE C. The National Environmental Policy Act (NEPA) documentation for the Project is inadequate.**

**RESPONSE:** In response to the lessee's submission of a proposed plan of operations, the BLM and the FS in cooperation and partnership with Bonneville Power Administration (BPA), and Siskiyou County Air Pollution Control District, completed the "Telephone Flat Geothermal Development Project Final Environmental Impact Statement/Final Environmental Impact Report" (FEIS/FEIR). The Preferred Alternative disclosed in the FEIS/FEIR was to approve the project.

In November 2002, a contracted, review report [Update Assessment for the Telephone Flat Geothermal Development Project Final Environmental Impact Statement/Environmental Impact Report, (FEIS/FEIR) hereby referred to as the "Update Assessment"] was completed. The purpose of the report was to evaluate the adequacy of the FEIS and determine whether or not the agencies needed to prepare and circulate a supplement to that NEPA document. The Update Assessment did not identify any new significant impacts resulting from the proposed action or project nor did it identify new mitigation measures or substantial increases in the anticipated severity of environmental impacts. In accordance with Forest Service NEPA Revised Policy and Procedures, the deciding officer's review documents that NEPA requirements had been fully met, the

FEIS was sufficient and a supplement was not necessary (Worksheet, Documentation of NEPA Adequacy).

**- Purpose and Need**
Submission of the Project proposal triggered the Agencies' need to analyze the development of geothermal resources on the federal leases involved in the Telephone Flat project. The purpose of the proposal is to economically produce and deliver electrical energy from leases identified in the proposed plan of operations. The manner in which the purpose and need of the proposed action is described in the EIS given the lessee's proposal, to which the Agencies had a legal obligation to respond, is completely consonant with NEPA, the Council on Environmental Quality's (CEQ) regulations implementing that Act, and the predominant body of case law which has addressed this issue.

Legal authorities cited in the FEIS Purpose and Need discussion support the national policy regarding the development of alternative energy sources. This issue was additionally addressed in the 2002 ROD (III. B.1). The determination concerning management of the area for geothermal energy development was made at the time the leases were issued.

**- "Reasonable Range" of Alternatives**
Section 102 (2) (C) of NEPA requires investigation and evaluation of reasonable alternatives to the proposed action that will accomplish the intended purpose. A range of reasonable alternatives was considered relative to the Purpose and Need of the proposal. The appeal cites 40 CFR 1502.14 that requires a Federal agency to explore and evaluate all reasonable alternatives. That provision does not require consideration of a "reasonable range" of alternatives.

In addition to the various transmission line alternative routes considered in detail, the FEIS also considered but eliminated from detailed consideration, additional routes (ES-16-19). Consideration was given to burying the line, however that alternative was found both to be excessively costly and to result in greater environmental impacts. Thus the alternative of burying the power line was dismissed from further detailed consideration.

The question at issue for the Forest Service and the BLM was whether to approve the plan of operations for the Telephone Flat Geothermal Development Project, not to determine the best way of providing energy in the area. Consideration of other increasing production in other geothermal areas and non-geothermal sources of energy are outside the scope of this analysis. The scope of the analysis was limited by the proposed plan of operations for the Telephone Flat Geothermal Development Project.

**- Socioeconomic Impacts on Native Americans**
Socioeconomic impacts on Native Americans are adequately considered in the FEIS (3.12). See also FEIS table 3.12 (ES-119) displaying impacts associated with the transmission line locations. The Update Assessment recognized no new mitigation measures or alternatives as a result of the consultation process. The Update Assessment

further acknowledges that the identified, significant socioeconomic impacts cannot be mitigated to an acceptable level. Nonetheless, selection of an action alternative in these circumstances does not demonstrated that the environmental analysis was flawed.

**- Cumulative Impacts of Several Projects**
The FEIS considers the Fourmile Hill geothermal development project and the Reduced Glass Mountain exploration project to be reasonably foreseeable and evaluates them along with the Telephone Flat geothermal development project in the cumulative effects section (FEIS 4-1-28). The fact that the transmission line and other facilities authorized for the Telephone Flat Project can be utilized to facilitate future development does not, by itself, establish that such development is reasonably foreseeable, Headwaters, Inc. v. BLM, 914 F.2d 1174, 1181-82 (9th Cir. 1990). Absent additional information, there are no other projects or proposals that are appropriately considered as being reasonably foreseeable.

**- Inadequate Environmental Analyses**
The adequacy of the analysis is dependant upon consideration of relevant matters of environmental concern. Moreover,

> [A]n EIS need not be exhaustive to the point of discussing all possible details bearing on the proposed action but will be upheld as adequate if it has been complied in good faith and sets forth sufficient information to enable the decision maker to consider fully the environmental factors involved and to make a reasoned decision after balancing the risks of harm to the environment against the benefits to be derived from the proposed action, as well as to make a reasoned choice between alternatives.

County of Suffolk v. Secretary of the Interior, 562 F.2d 1368, 1375 (2d Cir. 1977), cert. denied, 434 U.S. 1064 (1978).

Analyses of the affected environment and environmental consequences are detailed in Chapter 3 of the FEIS. Impacts and mitigation measures are identified and described. Exhibit 5 is the Medicine Lake Basin Comprehensive Hydrology Monitoring Plan. Analyses of impacts associated with water quality, seismic activity, air quality, visual quality and noise are contained in sections 3.2, 3.1, 3.4, 3.8 and 3.7 respectively. Included in the last pages of each section are descriptions of environmental consequences, impacts and mitigation specific to Alternative Transmission Line Route 2. The appellants have not demonstrated that impacts relevant to the proposed action were not adequately considered in the Final EIS and the Update Assessment.

Issues relating to the selection of mitigation measures for the environmental consequences associated with the cooling towers, turbine building, drill rigs, drill pads, well fields and other facilities not including the transmission line and temporary water line are outside of the scope of this appeal. Selection of such measures falls within the exclusive jurisdiction of the BLM whose decision is not subject to administrative appeal. Nonetheless, the Forest Service properly considered the environmental consequences

associated with the facilities and road access, as part of the cumulative effects analysis in Chapter 4 of the FEIS. A summary of the significant cumulative effects is included in Table ES.8 (Executive Summary of the FEIS, page ES-123-125). Impacts associated with the transmission line alternative routes are addressed in the FEIS and mitigation is identified to reduce those adverse effects, where possible. Some impacts are recognized as cumulatively significant and unavoidable or immitigable. These impacts and mitigation measures are summarized in table ES 6 (ES-95-123).

Section 102(2) (C) of NEPA does not prohibit action where environmental degradation will result, it merely mandates full consideration of the environmental impact of the proposed action. The FEIS and Update Assessment adequately disclose the environmental consequences of the Proposed Action, as modified.

**- Enhanced Geothermal System**

As previously mentioned, authority for the approval and mitigation of impacts resulting from down-hole activities fall under the jurisdiction of the BLM. Consequently, such challenges to acidization or enhanced geothermal system activities are beyond the scope of this appeal.

Nonetheless, the potential for impacts from enhanced geothermal system activities is addressed in the Update Assessment (2.1-2, 3.1-2, 3.2). Recognize, however, that enhanced geothermal system activities are standard industry practices that are routinely employed. There is no historical precedent suggesting that those activities pose a threat of adverse impact to water quality when conducted in accordance with approved methods. Additional discussion concerning regulation of the underground injection control program is contained on pages 3.2-1 and 3.2-2 of the FEIS and in Exhibit 6, Injection Well Monitoring.

**- Supplemental EIS or EA Required**

In order to comply with the CEQ regulations implementing NEPA, the previously discussed Update Assessment was prepared as part of the ROD reconsideration process to determine if significant new circumstances or information relevant to the environmental concerns and bearing on the project were identified since the FEIS was released in 1999. It was determined through this analysis that there was no change in the condition of the environment and no significant change in the impacts associated with the project. Therefore, a supplemental EIS is not required in order to approve the Telephone Flat Project, as modified.

**ISSUE D. Approval of the Project violates the National Forest Management Act and its implementing regulations.**

**RESPONSE:** As the new ROD noted, the geothermal leases at issue are examples of existing contracts that are specifically not modified by the National Forest Management Act (NFMA) or the Modoc National Forest Land and Resource Management Plan (LRMP). Indeed, the direction in the LRMP for the Medicine Lake Management Area is that "other management activity should not preclude geothermal development." The

forest-wide standard and guideline which calls for the protection and conservation of cultural resources therefore cannot correctly be read as a basis for denying the Proposed Action as modified, although that action regrettably will have adverse effects on cultural resources which cannot be fully mitigated. For these reasons, the decision under appeal is definitely consistent with NFMA and the LRMP (ROD, III.A.1). For similar reasons, issuance of the special use authorizations necessary for the Proposed Action, as modified, is consistent with 36 CFR 251.56(a)(1)(i)(G).

Special use authorizations for the Proposed Action, as modified, issued subject to the condition that the permittee must comply with all applicable air and water quality standards established by or pursuant to applicable Federal or State law satisfy 36 CFR 251.56(a)(1)(i)(C). Complying with such standards is the responsibility of the permittee and enforcing such compliance is the role of the federal or state agency with authority to administer the air or water quality standards, not the Forest Service. No other provision of the special use authorization regulations is an impediment to approval of the Proposed Action, as modified.

**ISSUE E. Approval of the Project is inconsistent with the National Historic Preservation Act.**

**RESPONSE:** As part of the reconsideration of the Record of Decision denying the project, consultation under Section 106 of the National Historic Preservation Act (NHPA) was re-initiated. Additionally, the Advisory Council on Historic Preservation (ACHP or the Council) held a public meeting and solicited input on the reconsideration. A record of various tribal, agency and public contacts made during the reconsideration process is included in the 2002 ROD.

Documentation of consultation termination was duly provided to the ACHP. The Council acknowledged this to be in accordance with 36 CFR 800.7, the relevant regulation implementing Section 106 of the National Historic Preservation Act, 16 USC 470f, (ACHP letter of September 5, 2002). Consideration of the Advisory Council's response is included in the 2002 ROD and formally documented in a November 26, 2002 letter from the deciding officials to the ACHP.

In accordance with NHPA, the agency made a reasonable effort in consultation with the ACHP, the State Historic Preservation Officer (SHPO) and the tribes to identify, evaluate and mitigate potential impacts to traditional/cultural resources. As a result, an alternate transmission line location was chosen and the project was also amended by incorporating additional Conditions of Approval and Agency Commitments to further reduce impacts to traditional values and uses (ROD, Sec. VIII). There is no requirement in law or regulation that the Forest Service obtains tribal concurrences prior to engaging in a Federal undertaking or manages federal lands to avoid all impacts on Native American uses and experience.

As discussed above, the decision under appeal is the Forest Service's approval of certain aspects of the Telephone Flat Geothermal Development Project, as modified. Issues

concerning compliance with conditions of the Fourmile Hill Memorandum of Agreement (MOA) are beyond the scope of this appeal.

The appellants also argue that the 1980's decisions to issue geothermal leases did not comply with the NHPA. The appellants and other members of the public had notice of the intent to issue leases when the 1981 Environmental Assessment was completed and the decision notice signed. Notice was sent to members of the public who had expressed previous interest and the decision was published in several newspapers of the area. Any objections to consent to the issuance of the subject leases should have been directed to the FS within the time provided by the then applicable FS administrative appeal procedures. Objections to the issuance of the leases themselves should have subsequently been directed to the BLM, the agency who is ultimately responsible for geothermal lease issuance. However, no such appeal or objection was filed with the Forest Service or the BLM. The time for objecting to the issuance of the subject leases has passed. Objections to BLM's subsequent extension of the leases also are not timely raised.

**ISSUE F. The agencies issuance and renewal of the Telephone Flat leases and reversal of the original Telephone Flat decision violated the federal government's fiduciary trust obligations to Indian tribes.**

**RESPONSE:** The Forest Service does have a federal trust responsibility to Indian tribes that attaches to the federal government as a whole. However, given that no specific duty has been placed on the Forest Service with respect to Indians, the Forest Service satisfies its general trust responsibility to Indian tribes by complying with general laws and regulations. As discussed in the remainder of this decision, I have found nothing that indicated the Forest Service failed to comply with general laws and regulations in approving the previously specified aspects of the Proposed Action, as modified. Therefore, the Forest Service satisfied its trust responsibility to the Indian tribes in approving the new ROD.

Further, the Forest Service appears to have kept its trust responsibilities to the Tribes at the forefront throughout the tribal consultation process and in developing approaches to lessen or mitigate adverse effects of the Proposed Action.

**ISSUE G. Approval of the Telephone Flat project without new source review violates the Clean Air Act.**

**RESPONSE:** As discussed above, the aspects of the Proposed Action, as modified, which were approved by the Chief of the Forest Service, include a transmission line, a road easement, temporary water well use and waterline placement and maintenance. In addition, the Chief approved a forest order prohibiting discharge of firearms within the vicinity of the power plant. Only these portions of the decision are subject to appeal in accordance with the regulations at 36 CFR 215.

The FEIS recognizes the potential for the generation of fugitive dust generated by travel on unpaved roads, mobile combustion emissions from construction activities and dust lofted by earthmoving activities during construction, operation and decommissioning activities. For transmission line segment D2 the impact is considered less than significant and other measures are provided (FEIS 3.4-36) to reduce even those impacts. For line segment B2 impacts are considered to be less than significant with the exception of a short-term significant $PM_{10}$ impact possibly occurring in close proximity to construction activities (FEIS 3.4- 1, 37). To address those impacts, the project applicant will be required to design and implement measures to control the generation of dust during transmission line construction. Mitigation measures such as application of water or dust palliative, construction vehicle speed limitations and haul truck covers could be included.

However, you did not suggest that the impacts of any of these activities approved by the Chief would result in a violation of the Clean Air Act. Thus, there is no reason to reverse the Chief's decision on the basis of a violation of the Clean Air Act.

**REVIEWING OFFICER'S FINDINGS**

The Reviewing Officer found the EIS/EIR was well documented, referenced numerous applicable information sources, analyzed the project in depth and considered all significant public input. Additionally, it was noted that a review of the document to determine the need for a supplement had been completed and resulted in the appropriate determination. The Reviewing Officer recommended I affirm the Chief's decision and deny the relief requested.

**DECISION**

I have considered all the issues set forth in your appeal in making my decision. To the extent that those issues are germane to the Chief's decision that I agreed to review, I determined that those issues are adequately addressed in the FEIS, by the Chief in the ROD, or in the administrative record for the Chief's decision.

I affirm the Chief's decision to approve the previously specified aspects of the Proposed Action as modified.

My decision constitutes the final administrative determination of the Department of Agriculture [36 CFR 215.18(c)].

Sincerely,

Mark Rey

Mark Rey
Under Secretary
Natural Resources and Environment

USDA

United States Department of Agriculture

Office of the Secretary
Washington, D.C. 20250

April 11, 2003

**MEMORANDUM FOR THE APPEAL DECIDING OFFICER**

Subject: Telephone Flat Geothermal Development Project Appeal

I am the designated Appeal Reviewing Officer (ARO) for this appeal. This is my recommendation on disposition of the appeal filed by Deborah A. Sivas of the Earthjustice Environmental Law Center at Stanford on behalf of the Pit River Tribe, Klamath Tribes, Native Coalition for Medicine Lake Highlands Defense, and Mount Shasta Bioregional Ecology Center.

**BACKGROUND**

In 1997, CalEnergy Corporation submitted a Plan of Operation and Special Use Application for the development of geothermal resources on and off Federal leases located within the Glass Mountain Known Geothermal Resource Area (KGRA). In February 1999, the Bureau of Land Management (BLM) and the Forest Service (FS), in cooperation and partnership with Bonneville Power Administration (BPA), and Siskiyou County Air Pollution Control District, released the "Telephone Flat Geothermal Development Project Final Environmental Impact Statement/Final Environmental Impact Report" (FEIS/FEIR). The Preferred Alternative disclosed in the FEIS/FEIR was to approve the project.

In May 2000, the BLM and FS signed a Record of Decision (ROD) denying the project. Subsequently, the project proponent filed a lawsuit in U.S. Court of Federal Claims against the two agencies alleging breach of contract and takings. Calpine Corporation acquired CalEnergy in November 2001. In April 2002, Calpine and the United States entered into an agreement to stay litigation and allow the agencies to reconsider the 2000 decision. On November 26, 2002, a new decision approving the proposal (as amended) was signed by the Chief of the Forest Service and the Assistant Secretary of the Department of Interior. Notification of the decision was published in the Modoc County Record on December 19, 2002.

An Equal Opportunity Employer

**Decision** - The 2002 ROD is a joint BLM and FS document. However, each agency is making decisions that pertain to separate activities identified in the Plan of Operation. The Forest Service's decision includes:

- Permitting construction, operation and maintenance of a 230-kV, overhead transmission line,
- Issuance of a road use permit for access to the power plant,
- Permitting temporary water well use and water line placement and maintenance,
- Issuance of a Forest Order prohibiting firearm discharge within the vicinity of the Telephone Flat power plant.

Only the Forest Service's portion of the decision is subject to appeal in accordance with the regulations at 36 CFR 215. Approval of the project constitutes the final administrative action for the BLM.

The Chief of the Forest Service, U.S. Department of Agriculture and the Assistant Secretary, Land and Minerals Management, U.S. Department of the Interior jointly decided to reverse the earlier decision and select the Proposed Action (proposed power plant site) with the modification of selecting Alternative Transmission Line Route 2 (segment D-2 and B-2) instead of Alternative Transmission Line Route 1. This Proposed Action, as modified, is now the Telephone Flat Geothermal Development Project, as Amended (the Project). As part of the 2002 ROD for Telephone Flat, the Project is further amended by incorporation of additional conditions of approval and agency commitments based on the principles within the Memorandum of Agreement (MOA) for the approved Fourmile Hill Geothermal Development Project (which is located in the Medicine Lake Highlands, approximately six miles northwest of the Telephone Flat project area).

**Scoping** – Although there was no requirement for public involvement during the reconsideration (as part of the Settlement Agreement), in completing the Section 106 process under the National Historic Preservation Act, numerous meetings were held with various tribes, interested parties and the public. A summary table of these meetings is included in the Record of Decision.

**APPEAL SUMMARY**

The Department of Agriculture has no record of receiving an administrative appeal timely filed by the Earthjustice Environmental Law Clinic at Stanford on behalf of the Appellants. The Appellants are unable to demonstrate compliance with 36 C.F.R. 215.13(c) by producing physical evidence showing their appeal bore a U.S. Postal Service postmark dated on or before February 3, 2003. As a matter of discretion, you have agreed to a review of the Appellant's administrative appeal. I have completed this review at your direction.

The appellants request that the November 26, 2003 Record of Decision for the Telephone Flat Geothermal Development Project be reversed and withdrawn and that the use

permits and other authorizations required for the Project be denied. They have not requested a stay of the Forest Service's implementation of the Telephone Flat Geothermal Project. An informal resolution meeting by telephone was conducted on April 1, 2003 between the Forest Service, appellants and interested parties. No issues were resolved.

Another appeal of the Chief's 2002 decision was received from Stephan A. Volker on behalf of Save Medicine Lake Coalition, Medicine Lake Citizens for Quality Environment, Fall River Wild Trout Foundation, Klamath Forest Alliance, California Wilderness Coalition and Sierra Club. This appeal was timely filed; and, on March 20, 2003, you signed the decision on their appeal and it was mailed to Mr. Volker.

Expressions of interested parties were received for both appeals. Robert Maynard, Attorney for CPN, Telephone Flat, Inc. and Calpine Corporation wrote letters, dated February 18, 2003 and March 28, 2003 in response to the two appeals. Both letters requested final decisions denying the appeals in their entirety in accordance with 36 CFR 215.17. Mr. Maynard concludes the subject appeal is untimely and therefore should be dismissed. Additionally, he concludes the allegations presented by the appellants have already been considered and rejected and that further delay of the project constitutes a breach and/or taking of CPN lease rights.

Issues -- Allegations included: Failure to specify appropriate need and purpose of the Project, failure to consider a reasonable range of alternatives, environmental analyses are inadequate, inadequate consideration of cumulative effects, Project is inconsistent with the Modoc National Forest Land and Resource Management Plan, failure to adequately consider impacts to traditional/cultural sites and values, failure to consider input from the State Historic Preservation Officer and the Advisory Council on Historic Preservation, failure to provide a supplement to the Environmental Impact Statement, project leases are invalid, failure to identify changes in energy needs, failure to analyze socioeconomic impacts on native-Americans, and violation of the federal government's fiduciary trust obligations to Indian tribes.

Purported Violations: Administrative Procedure Act, Geothermal Steam Act, National Historic Preservation Act, National Environmental Policy Act, National Forest Management Act, and Clean Air Act.

## RECOMMENDATION

My review was conducted pursuant to and in accordance with 36 CFR 215.19 to ensure the analysis and decision is in compliance with applicable laws, regulations, policy and orders. I reviewed the appeal record including the Appellant's objections and recommended changes.

Based on my review of the Record, I recommend the Chief's decision be affirmed based on the following Forest Service decision activities:

- Permitting construction, operation and maintenance of a 230-kV, overhead transmission line,

- Issuance of a road use permit for access to the power plant,
- Permitting temporary water well use and water line placement and maintenance,
- Issuance of a Forest Order prohibiting firearm discharge within the vicinity of the Telephone Flat power plant.

I recommend the Appellant's requested relief be denied on all issues.

**FINDINGS**

**Clarity of the Decision and Rationale** - I found the Chief of the Forest Service has provided the necessary rationale and purpose for the decision in the ROD. The project was modified in response to concerns. Selection of the Alternate Transmission Line Route 2 and the incorporation of conditions and commitments of the Fourmile Hill MOA describe and constitute reasonable modifications of the original alternative and to Calpine Corporation's Plan of Operation. The responsible officials have gone into considerable detail to respond to the concerns expressed by the Appellants of this project.

**Comprehension of the Benefits and Purpose of the Proposal** – The purpose and need for this action is consistent with the Modoc National Forest Plan and direction. The "no action" alternative is carried throughout the analysis. Explaination included in the ROD, Section B, Renewable Energy Needs, contributes to a better understanding of the selected alternative.

Calpine Corporation obtained geothermal leases issued by the Bureau of Land Management within the Glass Mountain Known Geothermal Resource Area. The leases provide the leaseholder the right to explore, develop and utilize the geothermal resources located within the boundary of the leases. As per stipulations of the leases, Calpine Corporation submitted a Plan of Operation in compliance with the process for exercising their rights as leaseholders.

**Consistency of the Decision with Policy, Direction, and Supporting Information** – The proposed action, as developed and as amended by the ROD, is consistent with known ecosystem management principles. The proposal appears to be consistent with Agency policy and direction as far back as the 1981 Environmental Assessment for Geothermal Leasing, which allowed for geothermal resource exploration and utilization of lands with in the Known Geothermal Resource Area.

The decision to select the Proposed Action as Amended is supported by rationale, information and analysis. A review of the EIS to determine the need for a supplement was completed and resulted in the appropriate determination. The decision is consistent with the Modoc National Forest Land Resource Management Plan. The analysis in both the EIS and the review of the EIS demonstrates compliance with existing management policy and direction. The ROD and EIS make appropriate findings required by law to affirm the project's compliance with the Administrative Procedure Act, Geothermal Steam Act, National Historic Preservation Act, National Environmental Policy Act,

National Forest Management Act, and Clean Air Act. The analysis utilized detailed resource information related to the project.

**Effectiveness of Public Participation Activities and Use of Comments** – The public, various government agencies and tribal governments have provided considerable input that has been significant in the design of the alternatives and the selected action. Issues and concerns identified during public meetings, government-to-government consultation and site visits are evident throughout the environmental document, the reconsideration documents and the new Record of Decision. The decision does not appear to have been made without due consideration and appreciation of cultural and social impacts associated with the transmission line and other activities. There is evidence of active public participation and Forest Service responsiveness, including a meeting of the Chief of the Forest Service with the Klamath and Pit River Tribes. Opportunity for public participation and tribal consultation was sufficient.

**Requested Changes and Objections of the Appellants** – The appeal, for the most part, reflects an understanding of the proposed action, location and information. There does appear, however, to be some confusion between the Fourmile Hill and the Telephone Flat geothermal projects. Issues concerning the approved Fourmile Hill project (not subject to appeal) are identified. Additionally it is not clear the Appellants understood which of the actions fall outside the jurisdiction of the Forest Service and therefore outside the scope of this appeal.

I recommend the requested relief be denied. The appeal file indicates the Forest Service took an interdisciplinary approach when developing alternatives as well as in the reconsideration process. Issues raised by the Appellants have been addressed in the environmental analysis.

**CONCLUSION**

I found the Telephone Flat Geothermal Development Project EIS was well documented and contained numerous references to applicable information. The project has been analyzed in depth and appropriate consideration and response have been given to significant public input. The project has been modified as a result of this input. The Proposed Action as Amended by the ROD appears to me to be the preferred alternative best serving the interests of the public.

Sincerely,

David Tenny
Deputy Under Secretary
Natural Resources and Environment

# EXHIBIT A6

**CALPINE**

4160 DUBLIN BOULEVARD
DUBLIN, CALIFORNIA 94568
925.479.6600
925.479.7312 (FAX)

July
~~June~~ 28, 2003

Mr. Scott K. Wilson
Account Executive PT-5
Bonneville Power Administration
905 NE 11th Avenue
Portland, OR 97232
Fax: 503-230-3681

Dear Mr. Wilson:

Thank you for meeting with us last week to discuss our agreements related to the Fourmile Hill and Telephone Flat geothermal projects. We thought that the meeting was productive, and we hope that with further discussions we will be able to advance the mutual interest of our organizations in the projects.

One of the items that we discussed was the April 11, 2003 decision by the Department of Agriculture in which they dismissed the last appeal of the November 26, 2002 Record of Decision approving the Telephone Flat project. At that point, the Telephone Flat Record of Decision became final.

With a final decision in hand, we have fully performed the requirements of Section 3.2 of the December 6, 1996 Settlement Agreement between Bonneville Power Administration and CPN Cascade, Inc. (formerly CE Newberry, Inc.) In accordance with that agreement, Bonneville has until August 14, 2003 to either issue its own record of decision approving the project and execute the power purchase agreement, or make the ROD Payment.

If you have any questions or we can provide further information on the project, we would be pleased to respond or meet with you. I can be reached at (925) 479-6646.

We look forward to hearing back from you on this matter.

Sincerely,

Jack Pigott

Jack Pigott
Director, Renewable Affairs

EXHIBIT
A6

# EXHIBIT A7

**Department of Energy**

Bonneville Power Administration
P.O. Box 3621
Portland, Oregon 97208-3621

POWER BUSINESS LINE

August 8, 2003

In reply refer to: PT-5

Mr. Jack Pigott
Calpine Corporation
50 West San Fernando Street
San Jose, CA 95113

Dear Mr. Pigott:

We are in receipt of your letter faxed on July 28, 2003. We also enjoyed meeting you July 15, 2003. The Bonneville Power Administration (BPA) does not, however, agree with your representation that Calpine or CPN Cascade, Inc. has fully performed the requirements of section 3.2 of the December 6, 1996, Settlement Agreement between BPA and CPN Cascade, Inc. (formerly CE Newberry, Inc.). BPA informed CPN Cascade, Inc. in a letter dated July 16, 2002, that BPA obligations under the Settlement Agreement were extinguished following the August 31, 2000, Regional Forester's record of decision denying the Telephone Flat Geothermal Project. No appeal of this decision was made by any party. A copy of the July 16, 2002, letter informing you of our decision is enclosed. We look forward to working with you on future endeavors between our companies.

Sincerely,

Scott K Wilson

Scott K. Wilson
Account Executive

ENC:

EXHIBIT
A7

# EXHIBIT B

**Department of Energy**

Bonneville Power Administration
P.O. Box 3621
Portland, Oregon 97208-3621

POWER BUSINESS LINE

January 28, 2005

In reply refer to: PT-5

Mr. Richard W. Oehler, Esq.
Perkins Coie
1201 Third Avenue, Suite 4800
Seattle, WA 98101-3099

Re: Contract Disputes Act Claim on behalf of CPN Cascade, Inc. (Telephone Flat/Glass Mountain Geothermal Project/Settlement Agreement)

Dear Mr. Oehler:

We have reviewed the request of CPN Cascade, Inc. (CPN Cascade) for a decision in the above referenced matter from the Bonneville Power Administration (BPA) regarding CPN Cascade's certified claim under the Contract Disputes Act, 41 U.S.C. §§ 601 *et seq.* After consideration of CPN Cascade's request, we have decided to deny the claim. As explained in BPA's prior correspondence to CPN Cascade regarding this matter, BPA's obligations under the Settlement Agreement were extinguished following the August 31, 2000, Regional Forester's record of decision denying the Telephone Flat Project.

If CPN Cascade is dissatisfied with our decision it may appeal in accordance with 41 U.S.C. §§ 606 and 609.

If you have any questions, please call me at (503) 230-5701.

Sincerely,

Debra Malin
Account Executive

cc:
Mr. Rick Thomas, Calpine

EXHIBIT
B